[No. 23445-5-I.   Division One.   October 15, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. LEWIS G. GRAHAM, *Appellant.*

*Dawn Monroe* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Lynn Moberly, Deputy,* for respondent.

BAKER, J.—Lewis Gerald Graham appeals his conviction of two counts of second degree statutory rape and one count of third degree statutory rape. He alleges the trial court erroneously admitted certain expert witness testimony, and that the State committed prosecutorial misconduct. We affirm.

# I
## FACTS

In February of 1988, C.S., then 15, told a counselor that she had been sexually abused by her stepfather, Lewis Graham. As reported, the first incident occurred shortly before C.S. reached age 13. One night, after C.S.'s sisters had gone to bed and while her mother was at work, Graham felt C.S.'s breast through her nightgown as the two watched television. The following night, again while C.S.'s mother was out, Graham entered C.S.'s bedroom and had sexual intercourse with her. A pattern of abuse evolved which included sexual intercourse three or four times a week until Graham moved out of the house at the end of that year.

Though living elsewhere, Graham periodically babysat C.S. and her sisters when their mother worked nights. On

those occasions Graham usually spent the night and frequently had intercourse with C.S. Another incident occurred in the summer of 1986 while traveling in Graham's van. One night Graham parked his van alongside the road and had intercourse with C.S. while her sisters slept. C.S. described another incident which occurred later in 1986 when Graham had sexual intercourse with her at Graham's house.

For a period of time in early 1987, C.S. and her sisters lived with Graham. C.S., then 14, had her own bedroom. Graham slept on the couch. As in the past, Graham frequently had sexual intercourse with C.S. after her younger sisters were asleep. Several months later the two younger girls returned to live with their mother. C.S. remained with Graham. However, in June of 1987, C.S. left Graham's home to live on the streets.

In November 1987, C.S. confided in her grandmother that she did not wish to continue the way she was living. Her grandmother then arranged for C.S. to be placed in a residential treatment center for adolescents in Oregon. In February of 1988, C.S. disclosed to her roommate that she had been sexually abused by Graham. At the roommate's urging she revealed the incidents of abuse to Dale Schumacher, a counselor at the center. Schumacher reported the matter to the authorities in Washington.

Graham was subsequently charged and convicted of two counts of second degree statutory rape and one count of third degree statutory rape. Former RCW 9A.44.080; former RCW 9A.44.090. This appeal followed.

## II
### EXPERT TESTIMONY

Graham first contends that the trial court erred by admitting certain expert testimony. Dale Schumacher testified that a delay by young women in reporting sexual abuse is not uncommon. Graham argues that Schumacher's testimony was improper because it was not based on a theory generally accepted in the scientific community—a test of

admissibility commonly known as the *Frye* standard.[1] *See* ER 702.

At trial, Graham made an issue of the delay between the last alleged incident of sexual abuse, occurring in June of 1987, and when C.S. first told others of the abuse in February of 1988. In rebuttal, the State called Schumacher. She testified concerning her relationship with C.S. and about her experiences with young women who have been sexually abused. Schumacher told the jury that based upon her training and experience, sexually abused girls often delay the reporting of sexual abuse. She testified that all of the girls with whom she had worked waited a period of time before disclosing their abuse. The State's direct examination elicited the following testimony:

Q. Based upon your own experience, as well as the information from the literature and the workshops that you have taken, in your opinion, is it uncommon that a young girl would wait some time before disclosing sexual abuse?

A. It is not at all uncommon that they wait.

Q. Okay. Based upon your experience with the girls who have reported sexual abuse to you, how many of those have waited a significant amount of time?

A. All of them.

Q. A hundred percent?

A. Yes.

Q. And in this particular case, C. waited eight months to report?

A. Yes.

. . . .

---

[1] In *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), the court held that the admission of expert testimony on the result of a systolic blood pressure deception test (first generation polygraph) made upon the defendant was inadmissible. In finding the test had not yet gained sufficient scientific recognition among physiological and psychological authorities, the court opined:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well–recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye,* 293 F. at 1014.

Q. Based upon your own experience with girls who have reported sexual abuse to you, what would you feel the most common time period is that you have seen?

A. I would say about a year.

Q. And in your opinion—again based upon the girls you have counseled, and the literature you have read and the workshops you have attended—why is it that the delay is so common?

. . . .

THE WITNESS: From my experience and in my opinion, the victims are generally very confused. They often don't know what has been happening to them during the time that it is happening. Their trust has been shattered, in adults in particular, and they generally don't report abuse until they feel that they are in a safe place where they can do that. And that can take a long time.

ER 702 governs the admissibility of expert testimony and provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ Expert testimony is admissible under this rule when (1) the witness qualifies as an expert, (2) the opinion of the expert is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony is helpful to the trier of fact. *State v. Allery,* 101 Wn.2d 591, 596, 682 P.2d 312 (1984). *See also Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). Ms. Schumacher's qualifications as an expert have not been challenged on appeal.

Graham relies upon *State v. Black,* 109 Wn.2d 336, 745 P.2d 12 (1987) to support his contention that Ms. Schumacher's testimony was scientifically unreliable. However, *Black* is not applicable. The issue in *Black* involved the admission of expert testimony on "rape trauma syndrome". The proponents of the syndrome recognize it as a collection of clinically identifiable behavioral reactions to forcible rape. The State sought to prove the victim was raped because she displayed certain symptoms. The evidence was admitted and the defendant was found guilty. The

Supreme Court found rape trauma syndrome scientifically unreliable as a means of proving lack of consent in rape. *Black,* 109 Wn.2d at 348. The court noted the syndrome's many critics, the lack of any general acceptance for the theory in the scientific community, and pointed out that the theory was not intended to be a forensic fact–finding device. *Black,* 109 Wn.2d at 347.

■ Graham argues that Schumacher's delay phenomenon testimony was merely another form of rape trauma syndrome evidence. He claims admission of the evidence amounted to saying "C.G. was abused and . . . Mr. Graham is the one who did it." However, unlike the evidence at issue in *Black,* the expert testimony admitted in the instant case was not offered to prove that the abuse occurred, rather that delay is not inconsistent with the presence of abuse. The court aptly summed up the testimony's purpose after questioning Schumacher during the State's offer of proof:

> THE COURT: Isn't it correct from what you have said, in determining the truth, the fact that it was reported the day before doesn't mean it happened, and the fact that one waits 10 years doesn't mean it happened, but it is not inconsistent with it happening in either case? Is that basically what you are saying?
> A. Yes.

The thrust of Graham's cross examination of C.S., indeed the entire thrust of Graham's defense, was designed to demonstrate to the jury that C.S. was not telling the truth. He stressed her delay in reporting the alleged abuse, inferring that the delay was evidence that she was in fact not abused. The State was properly permitted to rebut that inference through Schumacher's testimony.

Graham also contends that the admission of Ms. Schumacher's testimony was improper because it amounted to an expression of the witness's opinion on the issue of guilt, and thus invaded the province of the jury. We disagree. In *State v. Madison,* 53 Wn. App. 754, 770 P.2d 662, *review denied,* 113 Wn.2d 1002 (1989), this court discussed the

value of expert testimony concerning the delay in reporting sexual abuse.

To an average juror, it may appear that a delay in reporting [sexual abuse] by either an adult or a child, or a recantation of previous allegations, strongly indicates that the alleged event never happened. The testimony approved in . . . [*State v.*] *Petrich* [101 Wn.2d 566, 683 P.2d 173 (1984)], and that presented in this case, "will assist the trier of fact to understand the evidence or to determine a fact in issue". ER 702.

*Madison,* 53 Wn. App. at 765.

■ Moreover, in *State v. Petrich,* 101 Wn.2d 566, 683 P.2d 173 (1984), the court ruled that once a witness's credibility is at issue, evidence tending to corroborate the testimony may be obtained from an expert witness. *Petrich,* 101 Wn.2d at 575. Because Graham denied the acts charged, C.S.'s credibility was at issue during the trial.

While Schumacher's testimony was intended to help the jury understand the evidence, it was not, as Graham contends, offered as commentary upon his guilt. At no time did the witness directly or indirectly offer her opinion as to the truthfulness of C.S.'s allegations. *See Madison,* 53 Wn. App. at 760; *State v. Fitzgerald,* 39 Wn. App. 652, 694 P.2d 1117 (1985).

■ The trial court believed the testimony to be helpful to the trier of fact as rebuttal to Graham's attack on C.S.'s credibility. The case law expressly permits expert testimony for that purpose. *Petrich,* 101 Wn.2d at 575. The trial court enjoys broad discretion in determining the circumstances under which expert testimony will be allowed and this discretion will not be disturbed absent manifest abuse. *Madison,* 53 Wn. App. at 766; *Petrich,* 101 Wn.2d at 575. The admission of Schumacher's testimony that it is not uncommon for victims of sexual abuse to wait before disclosing that abuse was proper.

### III
#### PROSECUTORIAL MISCONDUCT

Graham contends that the prosecutor's cross examination and closing argument shifted the burden of proof by

requiring Graham to bring forth evidence to establish his innocence, thereby denying him a fair trial. Reviewed in context, however, the prosecutor's remarks were not improper.

■ To determine whether the prosecutor's comments denied Graham a fair trial, this court must decide whether the comments were in fact improper and, if they were, whether a substantial likelihood exists that the comments affected the jury. *State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984). The defendant bears the burden of establishing that the prosecutor's remarks were improper and that they were prejudicial. *State v. Mak,* 105 Wn.2d 692, 726, 718 P.2d 407, *cert. denied,* 479 U.S. 995, 93 L. Ed. 2d 599, 107 S. Ct. 599 (1986). If the prosecutor's misconduct is so flagrant that no instruction can cure it, a new trial is the mandatory remedy. *State v. Belgarde,* 110 Wn.2d 504, 508, 755 P.2d 174 (1988).

Graham testified that C.S. had a troubled past, including fights with her mother, stealing things and running away from home. He denied any sexual abuse. The following exchange occurred during the prosecutor's cross examination.

Q. Okay. What is it—what motivation does C. have to tell Dale Schumacher about these incidents, that she would make these up? You are saying it is not true, and why would she say something that is not true?

MR. KOLKER: Objection, Your Honor. I would ask—the question is clearly improper. It calls for speculation on the part of the witness to [word omitted from record] something that is clearly beyond his personal knowledge.

THE COURT: Sustained as to the form of the question.

Q. To your knowledge, does C. have any reason to lie about this?

A. No.

MR. KOLKER: Objection, Your Honor. Again, I think this question is irrelevant, and it is beyond the scope of the knowledge of this witness and it is argumentative.

MS. MOBERLY: Your Honor, the defense—

THE COURT: The objection to that question is overruled.

THE WITNESS: I don't know why. I mean, I couldn't tell you.

Q. There is not one single reason, is there?

MR. KOLKER: Objection, Your Honor.

THE COURT: Sustained.

Graham cites a series of cases in support of his argument that the prosecutor's line of questioning was inappropriate. However, the questions and remarks of the instant case do not compare to the flagrant and ill–intentioned comments made in the cited cases. For example, in *State v. Reed, supra,* the prosecutor called the defendant a liar, stated defense counsel did not have a case, referred to the defendant as clearly a "murder two", and asked the rural jurors if they were going to let city lawyers make their decision. The Supreme Court reversed because of the substantial likelihood the comments affected the jury's verdict. *Reed,* 102 Wn.2d at 147–48. However, in *State v. Green,* 71 Wn.2d 372, 380–81, 428 P.2d 540 (1967), also cited by Graham, the prosecutor asked the defendant whether his testimony meant that police witnesses were lying. There, the court ruled that the prosecutor's line of questioning was argumentative, but that the error was not so flagrant, persistent, or genuinely inflammatory as to warrant a new trial.

■■ A defendant may be vigorously cross–examined in the same manner as any other witness if he voluntarily asserts his right to testify. *State v. Etheridge,* 74 Wn.2d 102, 113, 443 P.2d 536 (1968); *State v. Olson,* 30 Wn. App. 298, 300–01, 633 P.2d 927 (1981). The scope of cross examination is within the discretion of the trial court and may be conducted so as to explain, qualify and rebut the defendant's direct testimony, including examination on issues he or she introduced to the jury. *Etheridge,* 74 Wn.2d at 113.

■ Throughout the trial, Graham focused the jury's attention on C.S.'s credibility, repeatedly portraying her as untruthful. Under such circumstances it was not unreasonable to allow the State to pursue the issue and inquire of Graham as to C.S.'s motive to lie about the abuse. The trial court sustained an objection to the prosecutor's final, argumentative question. Furthermore, the jury was instructed that the State had the burden of proving each element of

the crime beyond a reasonable doubt. Juries are presumed to follow instructions. *State v. Mak,* 105 Wn.2d at 702. There is no reason to conclude that the prosecutor's questions had the effect of shifting the burden of proof.

Graham also contends that the prosecutor's comments during closing argument labeled him a liar, insinuated that defense counsel believed his client guilty, disparaged the right to present a defense, and demeaned the role of defense counsel. The pertinent remarks of the prosecutor are as follows:

> The defense attorney told you he could come up with two plausible reasons for her to lie—his own client couldn't, but the defense attorney could make up two reasons for her to lie. And those reasons were because she wanted to get back at her mother for the way she treated her and because she wanted to get back at her dad for not letting her live with him.
>
> The first one doesn't make any sense at all. How is she possibly going to get back at her mother who doesn't even live with the defendant by saying this? It makes no sense at all.
>
> And as to the second one, is it reasonable?
>
> . . . .
>
> Do you think she wants to get back at him for not letting her sleep in the trailer? She denied that, incidentally. She said she didn't ask to live with her father; she didn't want to live with her father in the trailer. Why? Because she would be sexually molested.
>
> . . . .
>
> Instruction No. 1 instructs you that you are the sole judges of the credibility of the witnesses. If you believed C.G., then the state has proved the charges.
>
> And in determining whether you believe her, the jury instructions tell you to think about motive. What is her motive to lie? There is none. Only the defendant has a motive to lie, ladies and gentlemen.

Allegedly improper arguments should be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given. *See State v. Green,* 46 Wn. App. 92, 96, 730 P.2d 1350 (1986) (referring to statements that appear to be improper expressions of personal opinion). Remarks of the prosecutor, even if they are improper, are not grounds for reversal if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless

the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective. *State v. Dennison*, 72 Wn.2d 842, 849, 435 P.2d 526 (1967).

In closing argument, defense counsel attacked C.S.'s credibility. He referred to her as an "admitted liar" and as a girl "who lies about everything". Pointing out that defense counsel gave two reasons why C.S. may have lied and that the defendant himself could not think of one, was both a pertinent reply to Graham's argument and a reasonable inference that could be drawn from the evidence presented at trial. Demonstrating that defense counsel's theory was not supported by the evidence did not disparage Graham's right to present a defense or demean defense counsel. It is not misconduct for a prosecutor to argue that the evidence does not support the defense theory. *State v. Pacheco*, 107 Wn.2d 59, 71, 726 P.2d 981 (1986).

Graham argued at trial that the State's proof failed because it was incredible. The State turned this argument around, saying the defense argument was not credible. Each side tied its competing interpretation of the evidence to the trial testimony. The prosecutor is permitted a reasonable latitude in arguing inferences from the evidence, including references to a witness's credibility. *State v. Johnson*, 40 Wn. App. 371, 381, 699 P.2d 221 (1985); *see State v. Papadopoulos*, 34 Wn. App. 397, 401, 662 P.2d 59, *review denied*, 100 Wn.2d 1003 (1983). Counsel may comment on a witness's veracity so long as it does not constitute a personal opinion and is based on the evidence. *State v. Smith*, 104 Wn.2d 497, 510–11, 707 P.2d 1306 (1985).

We conclude that the prosecutor's comments did not constitute prosecutorial misconduct. Affirmed.

WEBSTER and PEKELIS, JJ., concur.