# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73955-7-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JAMES BRANT, JR., | ) | |
| Appellant. | ) | FILED: January 23, 2017 |

SPEARMAN, J. – Prior to James Brant's trial for assault, burglary, and interfering with domestic violence reporting, the trial court admitted evidence of prior incidents between Brant and his estranged wife, Deanna Brant. A jury convicted him of fourth degree assault and residential burglary. Brant appeals, arguing that the court abused its discretion in admitting the prior incident evidence. He also contends the prosecutor denied him a fair trial by disparaging defense counsel during closing argument. We affirm.

## FACTS

Based on allegations that Brant entered Deanna's residence without permission, assaulted her, and prevented her from using her phones, the State charged him with residential burglary, fourth degree assault, and interfering with domestic violence reporting.

No. 73955-7-I/2

Prior to trial, the court heard argument on the admissibility of incidents occurring in the months preceding the charged incident. The court admitted most of the prior incident evidence, stating:

> Some of it seems to me is res gestae and ought to be able to come in. . . . I will allow on direct, though, testimony from Ms. Brant on incidents . . . starting in September 2014 when she asked Mr. Brant [for a divorce]. And I think everything that goes from there forward is res gestae, and I do think that the incident, certainly **the March 27 incident I think is not only res gestae, it's I think very relevant to the issue of fear.**
> **And I think the fact that she called 911 on February 24 goes to the issue of fear.** And as far as that goes, counsel, it seems to me that the state needs to be in a position that they can introduce evidence of either a physical touching or the fear of imminent harm, unwanted touching. An assault is either and I don't think it's fair to the state to limit the state to having to convince the jury beyond a reasonable doubt that there was an actual touching . . . . **I think fear is a major factor in one of the elements in assault under the circumstances of this case.**
> So I'm going to allow everything that's been mentioned that the state . . . suggested they want to offer. I'll allow it on direct as long as it's from September 14 forward, and specifically **to include the February 24 incident where 911 was called and the March 27 incident, the so-called gun display incident, . . . or both as to fear on the part of the alleged victim here and as to res gestae.**[1]

The court excluded an incident involving an axe in 2007, ruling that it was too remote in time. It also excluded evidence that Deanna took a pistol from Brant's truck in 2014 because it was more prejudicial than probative.

At trial, the evidence established that in September 2014, Deanna told Brant she wanted a divorce. Brant was upset and told her "[h]e thought he could fix it [.]" Verbatim Report of Proceedings (VRP) at 188. In January 2015, Brant moved into a shop building the couple owned. Deanna remained in the family residence with their two sons, ages 14 and 20. She testified that once Brant

---

[1] VRP (7/27/15) at 21-22. (Emphasis added).

- 2 -

moved to the shop, he was no longer permitted to enter the family residence without her permission.

In February 2015, Brant and Deanna were discussing a matter at her residence when she asked him to leave. He refused, and Deanna said she would call 911 if he did not leave. Bryant challenged her to make the call, which she did. Shortly thereafter, a deputy arrived and was "able to have the defendant leave [Deanna's] home." VRP (7/28/15) at 101.

In late March 2015, Deanna obtained Brant's permission to enter his residence and pick up a television accessory when he was not home. When she entered Brant's bedroom, she found a shotgun, shells, wedding photos, and a note bearing her name and the words "last will and testament" on the bed. Deanna grabbed the television accessory and the items on the bed, including the gun, and left. She testified she took the gun because she was afraid Brant was planning to hurt himself. She put the gun in her bedroom closet.

On April 22, 2015, Brant called Deanna at home and asked if she needed anything from the market. She said no. About five minutes later, Deanna heard a knock at her door and saw Brant getting into his truck. When she opened the door, she found a gallon of milk on the doorstep. She thanked Brant for the milk and an argument ensued. Brant asked her why she had not filed for divorce. She responded that neither of them could afford an attorney and "we can't seem to have a civil conversation . . . so I guess that's what I need to do." VRP (7/28/15) at 111. As she walked back into the house, Brant got out of his truck and asked to use the bathroom. She told him to pee outside, but he pushed the door open and

walked into the house, past the bathroom, and into Deanna's bedroom. He retrieved his shotgun from her closet and told her he wanted his pistol. Deanna told him to leave.

As Brant walked past her, he took a sticky note off the shotgun and tried to put it on Deanna's chest. The note said, "[I]f you take this I will report it stolen. You don't need it. Stay the fuck out of my house." VRP (7/28/15) at 115. Brant proceeded to put the shotgun in his truck.

Brant continued to yell and demand his pistol. As Deanna tried to shut the front door, Brant returned, forced the door open, and pushed her up against the refrigerator. Deanna testified that he pushed against her shoulder and chest with both hands and was "[r]ight in her face." Id. at 116-17. Brant was "completely enraged and screaming" that he wanted the pistol. Deanna testified she "felt terrified" and "afraid for what he was going to do." Id. at 117.

When Brant released her, Deanna went to the kitchen to get a phone. Brant grabbed a coffee cup and smashed it in the sink, screaming that he wanted his pistol. Deanna picked up the phone, but Brant grabbed it from her and threw it into the laundry room where it broke. When Deanna tried to use a phone in the living room, Brant pushed her down on the couch and threw that phone into the dining room. He then shook water from an open water bottle onto her and said, "how do you like that, you stupid cunt." Id. at 120. He then crumpled the bottle and threw it at her. She again told him to leave.

Deanna saw her cell phone, but Brant grabbed it first and began walking toward the back door. Deanna pushed the panic button on her car keys, causing

the car's horn to start honking. She followed Brant outside and asked him to give back her phone. He threw the phone into the woods. When she tried to retrieve it, Brant ran past her and grabbed it. She asked him again for the phone, and he told her to give him his pistol. Brant subsequently left and Deanna called 911 from the phone in her bedroom.

The court played the 911 recording for the jury. During the call, Deanna told the 911 operator that Brant "broke both my other phones and took my cell phone and took a weapon that was here and pushed me . . . ." Id. at 137. When asked if she was hurt, she said "[h]e pushed me and threw stuff at me." Id. Deanna said Brant wanted his handgun but she "wouldn't give it back to him because he's been suicidal and I'm obviously scared of him." Id. at 139. When the operator asked about any damage, Deanna said:

> He broke—he threw some stuff and broke probably the two cordless phones I have because he didn't want me to call—I picked up the phone to call 9-1-1 and he grabbed it from me and threw it and picked up the other one and, um, pushed me down. And he pushed his way into the house . . . .

Id. at 140.

Deputy Robert Nou of the San Juan County Sheriff's Office testified that he responded to Deanna's 911 calls in February and April 2015. When he arrived at Deanna's residence after the February call, Brant told the deputy that he remained on Deanna's premises after her 911 call because he knew Deputy Nou "would need to talk to him [.]" Id. at 173.

When Deputy Nou arrived at Deanna's after her April 911 call, she was pale, withdrawn and upset. He took photos of broken cups, phones, a crumpled water bottle, and water in the living room area.

Deanna's treating physician, Dr. Robert Wilson, testified that he saw her shortly after the April incident. She was tearful and complained of elbow and wrist pain, which Dr. Wilson diagnosed as a bruise and a sprain. She said the injuries were the result of her husband's "physical abuse." Id. at 166.

After escorting Deanna to Dr. Wilson's clinic, Deputy Nou and another deputy called Brant and asked if he would come to the sheriff's substation. He declined, so the deputies drove to Brant's residence. Brant told the deputies he wanted his gun back and retrieved it from Deanna's residence. He admitted seeing the post-it note on the gun. He took the gun to his truck and then went back in the house. He said Deanna "was getting kind of upset and aggressive." When "she came at him," he "grabbed her and held her against the refrigerator to try and restrain her and get her to calm down." VRP (7/28/15) at 205. Brant claimed Deanna threw a phone at him, which he caught and then threw to the floor.

According to Deputy Nou, Brant said he wanted Deanna to talk about issues between them so he smashed a coffee cup on the floor to get her attention. She then headed toward her living room, and Brant followed. She picked up another phone, but Brant grabbed it, threw it, and broke it. Deanna moved toward the dining room for her cell phone, saying she needed to make a call. Brant got to the phone first and took it outside. He threw it over his truck, and he and Deanna

both went after it. Deanna told Brant he had broken all the phones in the house and she needed the cell phone to make a call. Brant said he paid the bills for the cell phone and she could use the cordless phone in the bedroom. Brant left the scene with Deanna's cell phone.

Brant testified and admitted he contemplated committing suicide with his shotgun. He testified, however, that he and Deanna had agreed not to enter each other's residences when the other was not home. He denied giving Deanna permission to enter his residence in March 2015. He admitted entering Deanna's home on April 22, 2015 "to take back a few things that she . . . took . . . from me," including the shotgun. Id. at 238. He retrieved the shotgun and "flicked the [post-it] note at her" as he left the house. Id. at 239-40.

Brant testified that after putting the shotgun in the truck, he asked Deanna for his pistol. They argued and then reentered the residence. Deanna threw a phone at him and he caught it. She then came toward him and he threw the phone down so his hands would be free. He grabbed her by the arms and held her against the refrigerator to try to calm her down. When he released her, he broke a coffee mug because he was angry.

Brant proceeded to the living room to get away from Deanna. He reached for a phone to call 911. Deanna reached for it at the same time and fell on the couch. She then came toward him, so Brant threw the phone to free his hands. He also threw water at her in an attempt to deter her advance. When he noticed her cell phone on the kitchen counter, he grabbed it and took it outside. Deanna attempted to grab it from him. He then attempted to throw it into his truck but

accidentally threw it over the truck. He retrieved it and said he would give it back to her if she gave him his pistol. Deanna said she did not have it and would not say who did. He told her she could use the bedroom phone if she needed to make a call. According to Brant, the only time she told him to leave was after he took the cell phone.

On cross examination, Brant admitted Deanna did not invite him into her residence at any point on April 22, 2015. He maintained, however, that their agreement only precluded him from entering the residence when she was not there.

The jury found Brant guilty of residential burglary and assault, but not guilty of interfering with domestic violence reporting. He appeals.

DECISION

Brant first contends the trial court abused its discretion in admitting the prior incident under ER 404(b) without balancing the probative and prejudicial values of the evidence on the record. We conclude any error was harmless.

Under ER 404(b), evidence of a defendant's other crimes, wrongs, or acts, is not admissible to show the defendant's character. It is, however, admissible for certain limited purposes, such as motive, opportunity, preparation, plan, knowledge, identity, or absence of mistake or accident. In addition to these exceptions to the general rule, Washington courts have recognized a "'res gestae' or 'same transaction' exception." State v. Lane, 125 Wn.2d 825, 831, 889 P.2d 929 (1995). That exception permits the admission of evidence otherwise precluded by the rule "'if it is so connected in time, place, circumstances, or

means employed that proof of such other misconduct is necessary for a complete description of the crime charged, or constitutes proof of the history of the crime charged.'" State v. Schaffer, 63 Wn.App. 761, 769, 822 P.2d 292 (1991) (quoting 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 115, at 398 (3d ed.1989). Courts admit res gestae evidence so that "a complete picture [will] be depicted for the jury." State v. Tharp, 96 Wn.2d 591, 594, 637 P.2d 961 (1981).

Before a court may admit evidence under an exception to ER 404(b), it must: (1) find by a preponderance of the evidence that the misconduct occurred; (2) determine whether the evidence is relevant to a material issue; (3) state on the record the purpose for which the evidence is being introduced; and (4) balance the probative value of the evidence against the danger of unfair prejudice. State v. Trickler, 106 Wn. App. 727, 732, 25 P.3d 445 (2001) (citing State v. Brown, 132 Wn.2d 529, 571, 940 P.2d 546 (1997)). This analysis must be conducted on the record. State v. Slocum, 183 Wn. App. 438, 448, 333 P.3d 541 (2014). We review a trial court's decision to admit evidence for abuse of discretion. State v. Finch, 137 Wn.2d 792, 810, 975 P.2d 967 (1999).

Here, the trial court admitted evidence of the February and March incidents as part of the res gestae of the charged offenses and/or as events bearing on the fear element of assault. Brant contends the court "necessarily abused its discretion" in admitting this evidence because it failed to balance the probative and prejudicial values of the incidents on the record. Brief of Appellant at 9. Assuming without deciding that res gestae evidence is subject to the requirements

of ER 404(b),[2] a failure to balance probative and prejudicial values on the record is harmless if a reviewing court can determine from the record that compliance with the requirement would not have changed the trial court's decision to admit the evidence. State v. Carleton, 82 Wn. App. 680, 686, 919 P.2d 128 (1996).

The record in this case indicates that on-the-record balancing would not have changed the trial court's decision to admit the evidence. The court readily excluded other incidents as either more prejudicial than probative or too remote in time. Thus, the court was fully aware of the balancing requirement for admitting the prior incident evidence. It is also clear from the record that the court concluded the prior incidents were admissible for multiple purposes and thus had substantial probative value. The record supports that conclusion.

The prior incidents shed light on a disputed issue in the burglary charge– i.e., the nature of the parties' agreement regarding their authority to enter each other's premises. The February incident was also probative of another disputed issue – Brant's intent in throwing and destroying the phones during the charged incident. Deanna's 911 call during the February incident supported an inference that Brant threw and destroyed the phones in the charged incident so that Deanna could not call 911.

The March incident also had additional probative value. The gun, wedding photos, and the "last will and testament" note bearing Deanna's name strongly

_____

[2] Division Two of this court has held that res gestae evidence is "not 'prior misconduct' of the type generally inadmissible under ER 404(b)" and should be analyzed under ER 401, 402, and 403, not under ER 404(b). State v. Grier, 168 Wn.App. 635, 647, 278 P.3d 225 (2012); but see, Lane, 125 Wn.2d at 831 (analyzing res gestae evidence under ER 404(b), but treating it as an exception).

indicated that Brant knew Deanna was coming to his residence that day. The items thus tended to corroborate Deanna's disputed testimony that she requested and received permission to enter Brant's residence. They also demonstrated that Brant was highly emotional about the pending divorce and was considering drastic action. The incident was therefore relevant to Deanna's fear on the assault charge.[3] In addition, the March incident served the res gestae purpose of explaining why Deanna had the gun that Brant entered her house to retrieve.

In sum, any error in failing to balance the probative and prejudicial values of the prior incidents on the record was harmless.

Brant next contends he was denied a fair trial because the prosecutor committed misconduct during the following closing argument:

> And I think one of the worst things about this type of case is when you were all here and I asked everybody does a victim have to be meek, there was nobody who said, yes, but isn't that always the argument when we get to this point. What did [defense] counsel say about Deanna Brant. She's not scareable. She sounded pretty scared to me on that tape and you can listen to it. **And it's offensive to consider, I'm sorry, that she was up here faking being upset.** You don't have to cower in a corner to be the victim of a crime. She said, yes, she was yelling back at him when he was in her house get out of my house. Yeah. He's the one that's not allowed to be there, he's the one who's doing these things to her in her home.

(Emphasis added.) VRP (7/29/15) at 325-26. Brant contends the emphasized remarks disparaged his counsel and constituted reversible misconduct. We disagree.

---

[3] The court instructed the jury that an assault "is also an act done with intent to create in another apprehension and fear of bodily jury [sic] and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the act did not actually intend to inflict bodily injury." VRP (7/29/15) at 299.

To establish prosecutorial misconduct, a defendant must show both improper conduct and prejudice. State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). Remarks that disparage defense counsel's role or integrity, as opposed to counsel's arguments, are misconduct. State v. Thorgerson, 172 Wn.2d 438, 451, 258 P.3d 43 (2011) (improper to disparage defense counsel's role or integrity);[4] Brown, 132 Wn.2d at 566 (prosecutor's characterization of defense argument as "ludicrous" was not misconduct in light of the evidence); State v. Graham, 59 Wn. App. 418, 429, 798 P.2d 314 (1990) (not misconduct to argue that defense theory is not supported by the evidence). But otherwise improper remarks are not misconduct if they were invited or provoked by defense counsel's closing arguments and are a fair reply to those arguments. State v. Brown, 132 Wn.2d at 561. When, as here, a defendant fails to object to alleged misconduct, reversal is warranted only if the misconduct was so flagrant and ill-intentioned as to be incurable by a curative instruction. State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997).

Brant contends the prosecutor's remarks were misconduct because they "referred to defense counsel's argument as 'offensive.'" Br. of Appellant at 14. But as discussed above, it is generally not misconduct to comment negatively on counsel's arguments. The remarks at issue here focused on counsel's argument and at worst only indirectly criticized defense counsel. The remarks were also

---

[4] See also State v. Reed, 102 Wn.2d 140, 143, 684 P.2d 699 (1984) (improper to urge jury not to be swayed by defendant's "city lawyers"); State v. Warren, 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008) (improper to argue that all defense attorneys mischaracterize evidence and twist the facts); State v. Gonzales, 111 Wn. App. 276, 284, 45 P.3d 205 (2002) (improper to argue that, unlike defense lawyers, prosecutors take an oath " 'to see that justice is served'"); State v. Negrete, 72 Wn. App. 62, 66-67, 863 P.2d 137 (1993) (improper to argue that defense counsel is being paid to twist the words of a witness).

provoked by defense counsel's earlier remarks suggesting that Deanna was not "scareable" and that her crying "in the right spots" during her testimony was inauthentic. VRP (7/29/15) at 325-26. In any event, to the extent there was any impropriety in the prosecutor's isolated remark, it was not so flagrant and ill-intentioned as to be incurable.[5]

Because Brant's claims of error fail, his cumulative error argument fails as well.

Affirmed.

WE CONCUR:

---

[5] See e.g., Warren, 165 Wn.2d at 29-30 (remarks disparaging defense attorneys in general and calling defense argument a "'classic example of taking these facts and completely twisting them ... and hoping that you are not smart enough to figure out what in fact they are doing'" were not so flagrant and ill-intentioned as to be incurable); Negrete, 72 Wn. App. at 66 (remark that defense counsel "'is being paid to twist the words of the witnesses'" was curable).