IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47573-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| RONALD GLENN DAUGHERTY, | |
| Appellant. | |

MAXA, A.C.J. – Ronald Daugherty appeals his convictions for three counts of second degree child rape relating to the sexual abuse of his step-granddaughter, HH.

We hold that the trial court did not abuse its discretion in (1) admitting testimony by Daugherty's now-adult daughter, AF, that Daugherty had sexually abused her when she was a child as evidence of a common plan or scheme under ER 404(b) because it was sufficiently similar to HH's alleged abuse, (2) denying a mistrial after AF made a reference to Daugherty being in prison because the reference did not connect his being in prison with sexual abuse, and (3) admitting expert testimony on delayed disclosure by child sexual abuse victims because it was helpful to the jury. We also hold that claims Daugherty asserted in a statement of additional grounds (SAG) lack merit. Accordingly, we affirm Daugherty's convictions of three counts of second degree child rape.

No. 47573-1-II

FACTS

*Sexual Abuse*

In August 2012, when HH was 12 years old, she and her family moved to Washington to live with Daugherty (her stepfather's father) and his wife. About a week after the family moved, Daugherty was beating HH at a game of blackjack when he suggested that, instead of paying him money, she "fool[] around" with him. Report of Proceedings (RP) at 466. HH and Daugherty went to the staircase, where he kissed her and felt her breasts with his hands.

Over the next year, Daugherty continued to abuse HH. HH would occasionally help Daugherty in his workshop. On multiple occasions, Daugherty had HH perform oral sex on him. During one instance, Daugherty used a digital camera to videotape the acts and engaged in anal intercourse with HH.

HH testified that she felt violated and knew the abuse was wrong, but decided not to tell anyone. She was scared, and she thought that saying something would hurt her family. Daugherty told HH that if she said anything, her family would split apart and would not talk to each other. HH also testified that she felt blackmailed. Daugherty had found "inappropriate messages" HH had exchanged with boys. RP at 487. He told HH that he would not tell her parents, but that she had to keep "fooling around" with him. Daugherty also let her use his tablet to send text messages.

The abuse continued after HH and her family moved into their own home nearby. Daugherty would call or message HH, requesting that she visit him. HH testified that Daugherty touched her breasts and vagina, once at his house, and once at the house of Daugherty's friend. Daugherty showed HH a pornographic video on his laptop, so that she could "do it right." RP at

536.  In the final instance of abuse, Daugherty had HH go upstairs to his bedroom where she performed oral sex on Daugherty before he engaged in anal intercourse with her.

On Christmas day of 2013, HH told her uncle what had happened between her and Daugherty.  HH had only seen her uncle a few times before that day, but she testified that she felt comfortable confiding in him.  HH's uncle and stepfather confronted Daugherty and later the police were called.  Daugherty was charged with four counts of second degree child rape.

*Prior Abuse of AF*

The State sought to introduce testimony from AF, who is HH's step-aunt and Daugherty's daughter.  AF had been abused by Daugherty when she was a child, resulting in Daugherty's convictions for first degree child molestation.  The State sought to admit AF's testimony as evidence of a common scheme or plan carried out by Daugherty.

In a pretrial hearing, AF testified that she lived with her mother until she was four years old, when AF and her brother (HH's stepfather) started living with Daugherty.  AF remembered Daugherty abusing her twice in the next two years.  The first time came when Daugherty caught AF with cigarette butts.  While they were alone in Daugherty's truck, he pulled over and started touching AF's vaginal area over her clothes.  The second came when Daugherty found AF playing in the attic in violation of house rules.  AF testified that he either pulled her pants down or asked her to pull them down and again touched her vaginal area.

AF and her brother moved to California for about two years before moving back in with their father.  Daugherty resumed abusing AF.  He again would touch her vaginal area, both above and underneath her clothing.  Daugherty also occasionally asked AF to sleep in his bed,

where he would rub AF with his hands and penetrate her with his fingers. At one point, Daugherty showed AF a pornographic magazine.

AF testified that over time the abuse got worse. When she was 10 or 11, Daugherty would "use [AF's] legs to have sex," going back and forth between her legs while they were both unclothed, touching his penis to her vagina but not penetrating. RP at 50. When AF asked Daugherty to stop, he responded that if she said anything he would go to prison, it would "tear the family apart," and he might die there. RP at 42.

Over Daugherty's objection the trial court determined that AF's testimony should be admitted to the jury. The trial court found AF to be "extremely credible," Clerk's Papers (CP) at 120, and found a "significant number of common factors" between AF's abuse and HH's abuse, even though there were differences. CP at 121.

*AF's Trial Testimony*

The trial court ruled that the parties could not elicit testimony about Daugherty's prior conviction. The court and the prosecutor instructed each witness on this issue. To AF, the trial court stated:

> We're not going to mention that your dad was convicted. We're not going to mention that he went to prison. . . . That kind of thing is off limits because we're trying not to let the jury know under any circumstances that he was, in fact, convicted or that he went to prison.

RP at 1665-66. On cross examination, Daugherty was asking AF about her contact with her brother and his family when she stated that Daugherty had been in prison:

> Q. Prior to [your brother and his family] moving to Washington, were you aware that they were contemplating moving in with your father and [his wife]?
> A. Yes.
> Q. And how did you become aware of that?

A. [My brother] had come to visit Washington, and my – I believe my dad was still in prison, but was – sorry.

RP at 1710-11.

Daugherty immediately objected and moved for a mistrial. The trial court denied the motion. When the jury returned, the trial court had the court reporter re-read the questions posed to AF. The trial court then instructed the jury that "[t]he response was nonresponsive. There was an objection to the response. I granted that objection. . . . [Y]ou're to disregard any answer entirely." RP at 1725.

*Expert Testimony on Delayed Disclosure*

The State also moved to admit expert testimony of a forensic interviewer, Patricia Mahaulu-Stephens, who had interviewed HH. The State wanted Mahaulu-Stephens to testify about the fact that child sex abuse victims often delay reporting their abuse. Over Daugherty's objection, the trial court ruled that the testimony was admissible, reasoning that the testimony would help the jury weigh HH's credibility.

At trial, Mahaulu-Stephens explained that disclosures are not a one-time event, but rather are processes that can take weeks and sometimes years to relay all the details. She explained that a victim's relationship with the abuser, fear of impacting that relationship, and the victim's sense of responsibility and shame can delay disclosure. She also noted that for adolescents it is common to disclose information to someone the victim does not know as well – "somebody that might not have a judgment or there might not be a consequence." RP at 1194.

*Daugherty's Testimony*

Daugherty testified in his defense, saying that HH had lied about the abuse. He stated that when he confronted HH about her inappropriate text messages she responded angrily, telling

5

him that he could not tell her what to do. He testified that HH said that she was aware of AF's prior accusations about him and told him that all she had to say was that he touched her and he would be in trouble. Daugherty said that he told his wife, son, and HH's mother about the threats, as well as a friend of his at church.

*Conviction*

The jury convicted Daugherty of three of the four counts of second degree child rape. Daugherty appeals his convictions.

ANALYSIS

A.    ADMISSION OF ER 404(b) TESTIMONY

Daugherty argues that the trial court erred in admitting AF's testimony that Daugherty sexually abused her when she was a child as evidence of a common scheme or plan under ER 404(b). We disagree.

1.    ER 404(b) Framework

Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, this evidence may be admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

Before a trial court admits evidence under ER 404(b), it must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value of the evidence against its prejudicial effect. *State v. Gunderson*, 181 Wn.2d 916, 923, 337 P.3d 1090 (2014). The proponent of the evidence has the burden demonstrating

that the evidence has a proper purpose. *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). And if the trial court admits the evidence, it must give upon request an appropriate limiting instruction to the jury. *Id.*

We review the decision to admit evidence under ER 404(b) for abuse of discretion. *Gunderson*, 181 Wn.2d at 922. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Id.*

2. Common Scheme or Plan

One accepted "other purpose" under ER 404(b) is to show the existence of a common scheme or plan, including when the defendant " 'devises a plan and uses it repeatedly to perpetrate separate but very similar crimes.' " *Gresham*, 173 Wn.3d at 421-22 (quoting *State v. Lough*, 125 Wn.2d 847, 855, 889 P.2d 487 (1995)). Similarity of results is not sufficient. *Gresham*, 173 Wn.2d at 422. The prior misconduct and the charged crime must demonstrate a sufficient number of "markedly and substantially similar" common features so that the similarities can naturally be explained as individual manifestations of a general plan. *Id.* But the method of committing the crime need not be unique or novel. *Id.*

Under the third element of the ER 404(b) analysis, the prior misconduct must be relevant to prove an element of the charged crime. One such element is whether a criminal act occurred. For the prior misconduct testimony to be admissible to show a common scheme or plan, it therefore must be sufficiently similar to the charged crime to be probative of whether the alleged act occurred. *See State v. DeVincentis*, 150 Wn.2d 11, 20, 74 P.3d 119 (2003) ("When the existence of the criminal act is at issue, evidence of substantially similar features between a prior act and the disputed act is relevant."). "[E]vidence that a charged crime was carried out in a

manner devised by the defendant and used by him more than once has a distinct and additional probative value [other than showing propensity] that justifies its admission." *State v. Slocum*, 183 Wn. App. 438, 456, 333 P.3d 541 (2014).

Washington courts have held in several cases that testimonial evidence of prior child sexual abuse committed by a defendant that is similar to the charged sexual abuse is admissible for the purpose of showing a common scheme or plan. *E.g.*, *Gresham*, 173 Wn.2d at 422-23; *DeVincentis*, 150 Wn.2d at 22-24; *State v. Kennealy*, 151 Wn. App. 861, 887-89, 214 P.3d 200 (2009); *State v. Sexsmith*, 138 Wn. App. 497, 505, 157 P.3d 901 (2007); *State v. Krause*, 82 Wn. App. 688, 697, 919 P.2d 123 (1996)). But to be admissible to show a common scheme or plan, evidence of prior child sexual abuse must show more than a general "plan" to molest children. *Slocum*, 183 Wn. App. at 453.

3.   Analysis

Daugherty argues that (1) AF's description of her sexual abuse and the sexual abuse alleged by HH were not similar enough to constitute a common scheme or plan and therefore was not relevant, and (2) AF's testimony was more prejudicial than probative. We disagree with both arguments.

a.   Similarity of Allegations

Here, Daugherty's sexual abuse of AF and alleged sexual abuse of HH had several similarities: (1) both AF and HH were close family members who Daugherty started abusing soon after they moved into his house, (2) Daugherty was an authority figure to both AF and HH and abused his position of trust, (3) Daugherty requested sexual favors as a way that AF and HH could avoid consequences for misbehavior, (4) Daugherty abused AF and HH in isolated

locations where he was alone with them, (5) Daugherty reduced both AF's and HH's inhibitions by showing them pornography and gradually increasing the seriousness of his sexual acts, and (6) Daugherty manipulated both AF and HH by saying that the family would break up if they disclosed the abuse.

As the trial court noted, there also were differences between AF's and HH's situation. However, an exact fit between the prior acts and the charged crime is not necessary. This court's decision in *Kennealy* is instructive. In that case, the defendant was charged with abusing three children unrelated to him – one boy and two girls between ages five and seven – by touching their genitals both over and under their clothing. 151 Wn. App. at 868-74. This abuse largely took place in the defendant's apartment, where the defendant enticed the children with gifts, often a popsicle. *Id.*

The State sought to admit testimony from several of the defendant's relatives who he fondled – four girls between ages seven and eleven. *Id.* at 875-76. Even though the defendant never offered the witnesses gifts and the abuse occurred at a variety of locations, admission of their testimony was not an abuse of discretion. *Id.* at 888. The trial court noted that similarities ran through each of the various instances of abuse: the acts occurred in a place or manner that went unnoticed by others; the acts occurred only after the children knew and trusted the defendant; the victims were all young; and the abuse of the girls occurred multiple times, both outside and under their clothing. *Id.* at 889.

The patterns of abuse in this case are also more similar to each other than in *Slocum*, where the court held that the admission of certain prior misconduct evidence was improper. 183 Wn. App. at 457. The victim in *Slocum* had suffered from recurring acts of abuse by her step-

9

grandfather, who would ask her to sit on his lap while he would rub her vagina both over and under her clothing. *Id.* at 443-44. The defendant had also abused the victim's mother (his step-daughter) and aunt. *Id.* at 445. He once touched his daughter's breasts after taking her shirt and bra off and, on another occasion, reached beneath the aunt's swimsuit top while applying sunscreen. *Id.* at 445-46. On a third occasion, the defendant told his daughter to sit on his lap, at which point he reached between her legs and began rubbing her vagina outside her clothes. *Id.* at 445.

The court held that it was an abuse of discretion for the trial court to admit testimony about the first two instances of abuse. *Id.* at 455-56. Rather than demonstrating a scheme or plan, the evidence suggested that the first two events were "opportunistic." *Id.* at 456. Those instances did not indicate anything more than the defendant's propensity to molest children, which is not the type of evidence allowed under ER 404(b). *Id.* On the other hand, the court held that the trial court did not abuse its discretion in allowing evidence of the defendant rubbing his daughter's vagina while she sat on his lap. *Id.* at 455. That abuse was similar to the victim's allegations. *Id.*

Daugherty's abuse of AF and HH demonstrates parallels that were missing in *Slocum*. Daugherty applied a similar plan of repeatedly abusing both victims over time, increasing the severity of the abuse as it became more normalized. He took advantage of his relationship with both victims, playing on their desire to keep their families intact with threats. And although the abuse took a slightly different form when it began with AF, it reached a similar point when she reached HH's age.

Finally, Daugherty argues that there is no scheme at issue because the similarities the trial court noted were not distinctive or unusual. But case law makes clear that uniqueness is not required. *DeVincentis*, 150 Wn.2d at 21. The question is whether the acts are similar, so that they could be " 'naturally . . . explained as caused by a general plan.' " *Id.* at 19 (quoting *Lough*, 125 Wn.2d at 860). The abuse of HH and AF, although not unique, was similar enough to show a common scheme.

We hold that the trial court did not abuse its discretion in ruling that AF's testimony was sufficiently similar to HH's allegations to show a common plan or scheme.

      b.    Balance of Prejudicial Effect and Probative Value

Even if the prior misconduct involved a common scheme or plan, the trial court must balance the probative value of the proposed testimony against its potential for undue prejudice to determine its admissibility. *Gresham*, 173 Wn.2d at 421. The prior misconduct is admissible only if its probative value clearly outweighs its prejudicial effect. *Lough*, 125 Wn.2d at 862.

Evidence of prior sexual misconduct is "likely to be highly prejudicial." *Id.*; *see also Slocum*, 183 Wn. App. at 442 (stating that the potential for prejudice from prior misconduct evidence is at its highest in sexual abuse cases). On the other hand, the probative value of common scheme or plan evidence is especially great in the child abuse context because of the victim's age and vulnerability, the absence of physical proof of the crime, the degree of public disapproval of the accusation, and a lack of confidence in the jury's ability to assess a child witness's credibility. *Kennealy*, 151 Wn. App. at 890; *see also DeVincentis*, 150 Wn.2d at 23.

In this case, the trial court found AF's testimony to be highly probative. Although it noted that the testimony had the potential to be extremely prejudicial, the trial court concluded

11

that any potential for *unfair* prejudice was outweighed by the testimony's probative value. The trial court also limited the risk of unfair prejudice by instructing the jury immediately before AF testified that the evidence could be used only to determine whether Daugherty had a common plan and not for any other purpose and by providing a similar written instruction.

The probative value of AF's testimony was increased by the lack of physical evidence in this case, which made HH's credibility a key issue. Daugherty argues that prior misconduct evidence was not necessary because HH was able to testify about the sexual abuse. But HH had a difficult time speaking about the abuse or remembering details of her abuse, which Daugherty repeatedly pointed out and questioned her about. Daugherty also denied basic details of HH's testimony, further questioning HH's credibility. AF's testimony could properly be admitted to address these elements of the State's case without excessively prejudicing Daugherty.

We hold that the trial court did not abuse its discretion in ruling that the probative value of evidence of AF's abuse outweighed its prejudicial effect.

c. Summary

We review the trial court's admission of common scheme or plan evidence for an abuse of discretion. *Gunderson*, 181 Wn.2d at 922. Here, the trial court carefully analyzed the similarities and differences between AF's abuse and HH's allegations of abuse, and concluded that the common factors were more compelling than the subtle differences. Similarly, the trial court weighed the probative value of AF's testimony against its prejudicial effect and concluded that the evidence was admissible. We hold that the trial court did not abuse its discretion in reaching these conclusions. Accordingly, we hold that the trial court did not err in admitting AF's testimony about Daugherty's prior sexual abuse of her.

B.     DENIAL OF MISTRIAL MOTION

Daugherty argues that the trial court abused its discretion by not declaring a mistrial after AF mentioned that her father had been in prison. We disagree.

We review a trial court's denial of a mistrial for abuse of discretion. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). In evaluating a motion for a mistrial, we consider (1) the seriousness of the irregularity, (2) whether the irregularity involved cumulative evidence, and (3) whether the trial court instructed the jury to disregard the evidence. *Id.* These factors are considered with deference to the trial court because the trial court is in the best position to discern prejudice. *State v. Garcia*, 177 Wn. App. 769, 776-77, 313 P.3d 422 (2013). A trial court should only grant a mistrial if there is such prejudice that nothing short of a mistrial will ensure a fair trial. *Emery*, 174 Wn.2d at 765. A trial court's denial of a mistrial is an abuse of discretion only when no reasonable judge would have reached the same conclusion. *Id.*

Two cases address a mistrial motion based on a witness's improper reference to the defendant's prior conviction or prison time. In *State v. Escalona*, the defendant was charged with assault with a deadly weapon. 49 Wn. App. 251, 252, 742 P.2d 190 (1987). Despite the trial court's exclusion of any references to the defendant's prior conviction for the same crime, a witness stated that the defendant "ha[d] a record and had stabbed someone." *Id.* at 252-53. The court held that the trial court should have granted a mistrial, noting that the statement was "extremely serious" and "inherently prejudicial." *Id.* at 255-56. The court reasoned that the irregularity could not be cured by an instruction, in part because of the "logical relevance" between the witness's statement and the charged crime. *Id.* at 256. The court believed that the

13

jury would conclude that the defendant had acted in conformity with the "assaultive character" he had demonstrated in the past. *Id.*

In *State v. Condon*, a witness in a murder trial twice stated that the defendant had been in jail, despite the trial court's ruling that such evidence be excluded. 72 Wn. App. 638, 648, 865 P.2d 521 (1993). Despite these references, the court affirmed the trial court's denial of a mistrial. *Id.* at 649-50. The court distinguished *Escalona*, reasoning that the improper statement in that case had indicated that the defendant committed a crime similar to the charged crime. *Id.* at 649. In contrast, in *Condon* the reference to the defendant's time in jail was ambiguous – the witness at one point mentioned that the defendant called her "when he was getting out of jail" and at another implied that she had picked him up from jail. *Id.* at 648. The court held that these statements "[did] not indicate a propensity to commit murder." *Id.* at 649. The court noted that the jury could have concluded that the defendant was in jail for a minor offense and that the fact that the defendant was in jail did not necessarily mean he has was convicted of a crime. *Id.*

Here, AF's statement did not connect Daugherty's presence in prison with her allegations or sexual abuse. Unlike in *Escalona*, AF did not state that Daugherty was in prison because of child sexual abuse. As in *Condon*, the statement was ambiguous. There was no indication that Daugherty had been convicted of any crime, much less for one related to the current charges. Further, the statement occurred only once. Therefore, the irregularity was not so serious that a mistrial was required.

In addition, the trial court instructed the jury that AF's statement was nonresponsive, that the trial court had granted Daugherty's objection, and that the answer should be disregarded entirely. Because AF's statement was ambiguous, this instruction provided a sufficient remedy.

14

We hold that the trial court did not abuse its discretion in denying Daugherty's motion for a mistrial.

C.    ADMISSION OF EXPERT TESTIMONY ON DELAYED DISCLOSURE

Daugherty argues that the trial court erred in admitting expert testimony regarding child sexual abuse victims' delay in disclosing their abuse because such testimony was unnecessary and unduly bolstered HH's credibility.  We disagree.

ER 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  Testimony should be admitted under ER 702 when (1) the witness is qualified as an expert, (2) the expert's opinion is based on a theory generally accepted by the scientific community, and (3) the expert's testimony is helpful to the trier of fact.  *State v. Rafay*, 168 Wn. App. 734, 784, 285 P.3d 83 (2012).  Testimony is helpful when it concerns issues outside common knowledge and is not otherwise misleading.  *See id.*  Courts should interpret helpfulness broadly and in favor of admissibility.  *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011).  We review a trial court's admission of expert testimony under ER 702 for abuse of discretion.  *State v. Cheatam*, 150 Wn.2d 626, 645, 81 P.3d 830 (2003).

In this case, Daugherty contests only whether the expert's testimony was helpful.  He argues that HH's stated reasons for not disclosing the abuse earlier – that Daugherty knew she was sending inappropriate text messages and that he protected her from her parents' punishment – were easy for any juror to understand and therefore HH did not require the support of an

expert. Daugherty argues that under these circumstances, Mahaulu-Stephens essentially was vouching for HH.

But in many situations, it might be reasonable to doubt an alleged victim's delayed report of a crime. Jurors may understand a delay in reporting sexual abuse to indicate the alleged event never happened. *State v. Graham*, 59 Wn. App. 418, 425, 798 P.2d 314 (1990). For that reason, courts have recognized that expert testimony is "expressly permit[ted]" to rebut an attack on a victim's credibility. *Id.*; *see also State v. Grant*, 83 Wn. App. 98, 109, 920 P.2d 609 (1996) (noting that expert testimony could be used to explain a domestic violence victim's inconsistent conduct).

The trial court in this case recognized that because delayed disclosure is a recognized phenomenon, expert testimony would assist the jury regarding whether HH was credible. Mahaulu-Stephens testified about delayed disclosure generally, informing the jury about the reasons why a child might wait to disclose abuse. She then described her interview with HH. This information allowed the jury to better assess HH's credibility.

We hold that the trial court did not abuse its discretion by allowing expert testimony on delayed disclosure.

D.    CUMULATIVE ERROR

Daugherty argues that even if no single issue amounts to reversible error, taken together they materially affected the trial's outcome. We disagree.

Although it is possible for otherwise harmless errors to cumulate, "[t]he defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary." *State v. Yarbrough*, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009). The cumulative error doctrine

"does not apply where the errors are few and have little or no effect on the outcome of the trial." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

Daugherty has not demonstrated that the errors he alleges so impacted his trial that there is reason to doubt its result. The only error Daugherty properly identified – AF's statement about his being in prison – was adequately addressed by a curative instruction. We reject Daugherty's cumulative error claim.

E.    SAG CLAIMS

1.    Exclusion of Sexually Explicit Text Messages

Daugherty asserts that the trial court erred by not admitting evidence of sexually explicit text messages allegedly sent by HH because they refuted the notion that HH learned the explicit terms from Daugherty. We disagree because the text messages were not authenticated.

In a pretrial hearing, the State sought to exclude a printout of text messages from an account used by HH, arguing that they were written by a friend using HH's device. The trial court ruled these messages to be inadmissible because they lacked foundation showing HH authored them.[1] But the trial court allowed the parties to ask about HH's familiarity with certain sexually explicit terms.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." ER 901(a). To meet this requirement, the proponent "must make a

---

[1] The trial court also excluded the text messages because (1) they were offered to show HH's sexual promiscuity, a purpose barred by the rape shield statute, RCW 9A.44.020; and (2) their prejudicial effect outweighed their probative value. Because we affirm the trial court's exclusion of the evidence on authentication grounds, we do not address these rulings.

prima facie showing consisting of proof that is sufficient 'to permit a reasonable juror to find in favor of authenticity or identification.' " *State v. Bashaw*, 169 Wn.2d 133, 140-41, 234 P.3d 195 (2010) (quoting *State v. Payne*, 117 Wn. App. 99, 106, 69 P.3d 889 (2003)). We review a trial court's admission of evidence for abuse of discretion. *State v. Young*, 192 Wn. App. 850, 854, 369 P.3d 205, *review denied*, 185 Wn.2d 1042 (2016).

When admitting text messages as substantive evidence, courts have found certain authenticating criteria helpful. These criteria include: (1) an admission of ownership by the sender, (2) any identifying information in the message, (3) an indication of the sender's identity by the contents of the message, and (4) any other identification of the sender based on the context in which the message was sent (e.g., timing).[2] *In re Det. of H.N.*, 188 Wn. App. 744, 758, 355 P.3d 294 (2015), *review denied*, 185 Wn.2d 1005 (2016); *see also Young*, 192 Wn. App. at 855-58 (identifying and applying similar factors).

Here, the first three *H.N.* criteria did not help determine who sent the text messages. HH did not admit that she sent the text messages. She testified that her friend sent them using HH's device when HH visited Ohio in June 2013. There was no identifying information in the messages and the contents did not reveal the sender's identity.

Regarding the fourth criterion, the parties disputed when the text messages were sent. HH claimed that the text messages were sent when she visited her friend in Ohio. Daugherty claimed that he found the messages before HH visited Ohio. Daugherty testified that when he

---

[2] In addition, ER 901(b)(10) provides three categories of evidence to be considered for the authentication of emails, which the court in *H.N.* applied to text messages by analogy. 188 Wn. App. at 759. The third category, which identifies as relevant to authentication "the appearance, contents, substance, internal patterns, or other distinctive characteristics of the e-mail, taken in conjunction with the circumstances," is similar to *H.N.* criteria (2), (3), and (4). ER 901(b)(10).

saw the messages, he printed them out and showed them to his wife, who confirmed that Daugherty showed her a printout of the messages in March or April 2013. As a result, the only way to determine whether HH sent the message was to weigh the credibility of one party's statement against the other party's statement. The trial court did this, concluding that HH's version of events was more credible. The trial court is in the best position to make this credibility determination. *State v. Hawkins*, 181 Wn.2d 170, 182, 332 P.3d 408 (2014).

We hold that the trial court did not abuse its discretion in ruling that the text messages lacked adequate foundation.[3]

2.     Exclusion of Daugherty's Prior Consistent Statements

Daugherty asserts that the trial court erred when it prevented him from testifying about prior consistent statements he made to others about HH's threat to say he abused her. We disagree because the trial court did allow Daugherty to testify about those statements.

In a pretrial hearing, the trial court confirmed that under ER 801(d)(1) a declarant may testify to prior consistent statements in order to rebut a charge of recent fabrication. The trial court ruled that if Daugherty chose to testify, he would be able to introduce the statements he made to others about HH's threats. The issue came up again during trial, and the trial court reiterated that Daugherty could testify that he told HH's mother and father about the threats. Daugherty then testified on direct and cross examination that he told HH's mother and father about her threat to him. Daugherty does not indicate any other way in which the trial court prevented him from presenting this evidence.

---

[3] Daugherty also argues that the trial court's ruling deprived him of his constitutional right to present a defense. But a defendant has no right to present inadmissible evidence. *State v. Aguirre*, 168 Wn.2d 350, 363, 229 P.3d 669 (2010).

We hold that the trial court did not prevent Daugherty from testifying about prior consistent statements he made to others.

### 3. Admission of AF's New Disclosures

Daugherty asserts that the trial court erred by admitting new factual allegations AF made against him for the first time during this case. But there is no authority for the proposition that prior misconduct evidence is admissible only if that evidence had been revealed in prior proceedings. If Daugherty believed that AF was making allegations that she had not previously made, he could have cross-examined her on that issue. We hold that the trial court did not err in admitting AF's testimony even though it may have contained new disclosures.

## F. APPELLATE COSTS

Daugherty requests that this court refrain from awarding appellate costs if the State seeks them. Under RCW 10.73.160(1), we may order offenders to pay appellate costs. However, we have the discretion to not award costs. RAP 14.2; *State v. Sinclair*, 192 Wn. App. 380, 389-90, 367 P.3d 612, *review denied*, 185 Wn.2d 1034 (2016).

Here, the trial court found that Daugherty was indigent. We presume under RAP 15.2(f) that a defendant remains indigent "throughout the review" unless the trial court finds that his financial condition has improved. Further, Daugherty has been sentenced to life in prison. There is no indication that he will ever be able to pay appellate costs. Therefore, we exercise our discretion to waive appellate costs.

## CONCLUSION

We affirm Daugherty's convictions of three counts of second degree child rape.

No. 47573-1-II

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

MAXA, A.C.J.

We concur:

WORSWICK, J.

SUTTON, J.