IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 78805-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARLOWE AIRHART-BRYON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — Marlow Airhart-Bryon appeals his convictions of three counts of first degree child molestation. He seeks a new trial, arguing evidentiary rulings prevented him from putting on his chosen defense, the use of his victim's initials in court documents violated the open court requirement of Washington's constitution, the use of his victim's initials in the jury instructions prevented him from receiving a fair trial, the prosecutor committed misconduct in five different ways, and he was convicted by a nonunanimous jury. Airhart[1] fails to establish any error warranting a new trial.

---

[1] We refer to the appellant as Airhart because his trial attorney stated, "[J]ust 'Airhart' is fine for my client." Report of Proceedings (RP) (June 21, 2018) at 44.

Airhart also seeks resentencing for his post-incarceration special conditions of community custody. He argues, and the State agrees, the lifetime no-contact order prohibiting contact with his biological daughter requires reconsideration. We accept the State's concession. Airhart also argues the restrictions on his work location are not related to his crime and must be stricken. We agree. Finally, he contends other conditions, including that he disclose his sex offender status to sexual partners, are not crime related and violate both his First and Fourteenth Amendment rights. Airhart fails to show those conditions are not crime related or infringe upon his constitutional rights.

Therefore, we affirm Airhart's convictions and remand for proceedings consistent with this opinion.

### FACTS

Airhart met Chelsie Reno in late 2009 or early 2010. Reno, already a mother to her three-and-a-half year-old son R.F., soon became pregnant with a daughter. She and Airhart began living together. The relationship was soon "in discord" and in 2013, Reno and her children moved to Tri-Cities.[2]

About one year later, Reno and her children moved back to Seattle and moved in with Airhart. Right away, she "start[ed] noticing weird things" such as Airhart sitting in his car for 12 hours during the night or "not sleeping at all."[3] Reno

---

[2] RP (July 2, 2018) at 449.

[3] Id. at 455; RP (July 10, 2018) at 833.

discovered Airhart was using methamphetamine. She also discovered he was seeing other women.

On July 31, 2015, Reno came home from work, and Airhart said he "was serving [her] eviction notice."[4] A "very ugly scene" ensued, and Airhart assaulted Reno.[5] The night ended with Reno, her daughter, and R.F. arriving, shoeless, at Reno's friend's house in the middle of the night.

In October, Reno was preparing her daughter for a supervised visit with Airhart, and her daughter said she did not want to go. Reno asked R.F. about it. He began sobbing and said, "Am I going to get in trouble for what [Airhart] did to me?"[6] R.F. said Airhart was "doing bad things."[7] He eventually revealed Airhart molested him dozens of times while they lived together.

The State charged Airhart with three counts of first degree child molestation. The information charging Airhart accused him of molesting "R.F." rather than using a full name. Every subsequent document also used the initials "R.F." But when R.F. testified and when the parties referred to him at trial, they used his full name.[8] The jury found Airhart guilty on all three counts.

---

[4] RP (July 2, 2018) at 457.

[5] Id.

[6] RP (July 9, 2018) at 683.

[7] RP (July 2, 2018) at 484.

[8] E.g., id. at 411 (State referring to R.F. by his name in opening argument); at 421 (defense doing the same); RP (July 9, 2018) at 689 (R.F. beginning his testimony by giving his full name).

The court sentenced Airhart to 120 months' incarceration and imposed conditions of community custody.

Airhart appeals.

## ANALYSIS

### I. Right to Present a Defense

As a threshold matter, the State argues this issue is not properly before us because Airhart violated RAP 10.3(a)(4) by not properly assigning error or identifying an erroneous ruling. Although Airhart did not designate a specific ruling—likely because there is no single, identifiable ruling on this issue—his failure did not limit the State's ability to respond. Because the State experienced no prejudice from Airhart's technical violation and we are able to fully analyze the issue, we will consider his argument.[9]

The core of Airhart's argument is that the court's rulings prevented him from establishing his theory of the case.[10] We review a court's decision to exclude

_____

[9] See State v. Olson, 126 Wn.2d 315, 323, 893 P.2d 629 (1995) (technical violations of the Rules of Appellate Procedure should not prevent a court from reaching an issue's merits unless a party is prejudiced or the court is greatly inconvenienced by the violation); see also RAP 1.2(a) (the RAP "will be liberally interpreted to promote justice and facilitate the decision of cases on the merits.").

[10] Airhart also argues the court prejudiced him by "preclud[ing] cross-examination regarding the July 31st [assault] incident, subsequent court hearings, and evidence regarding [Reno's daughter's] interviews [with a child abuse specialist], and the family court case." Appellant's Br. at 19. But Airhart mischaracterizes these rulings. He is simply incorrect that the court precluded cross-examination regarding the July 31 incident and subsequent court hearings. E.g., RP (June 21, 2018) at 29-30 (ruling allowing testimony around the July 31, 2015 assault and subsequent court proceedings); RP (July 2, 2018) at 474 (Airhart asking Reno about filing for a protective order after the July 31 assault). The court

4

evidence for abuse of discretion.[11]  Airhart was clear and consistent about his theory of the case from its outset.  As Airhart's counsel explained during a pretrial hearing:

> [F]rom the defense's perspective this case and a previous case [in which Airhart was convicted of assaulting Reno and Reno accused him of rape] all arose after a relationship went sour.  Essentially, beware of the wrath of a woman scorned.  That would be a good way of stating what the defense is in this matter.  Subsequent[ly], the victim's mother made allegations against my client and there are other issues that led up to the fact that she did not want him to have any contact with her kids, either.[12]

Essentially, Airhart's defense was that Reno made false rape and assault claims against him in 2015, which resulted in his prosecution, and that she did it again to prevent him from seeing his daughter.

Airhart wanted to question the State's witnesses about their past conduct to prove his theory.[13]  For example, he wanted to ask, "whether this was an allegation that was truly made by [R.F.], or whether there had been any discussion between [Reno] and [R.F.] about making these allegations."[14]  Because Airhart

---

also allowed testimony about the family court case.  E.g., RP (July 2, 2018) at 477-78 (Airhart cross-examining Reno about rulings in the family court case).  And the court permitted questions establishing that Reno's daughter was interviewed, id. at 488 (Airhart asking Reno "weren't [Daughter] and [R.F.] interviewed again?"), although it did not let Airhart explore the substance of those interviews.  Id. at 515.

[11] State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003).

[12] RP (June 21, 2018) at 17.

[13] See, e.g., id. at 22 (Airhart arguing he should be allowed to ask "whether there had been any discussion between her and [R.F.] about making these allegations.").

[14] Id.

sought to introduce evidence to "prove the character of a person in order to show action in conformity therewith," ER 404(b) applied.

The general presumption is that evidence of prior bad acts is inadmissible.[15] To be introduced, a "prior act[ ] must be '(1) proved by a preponderance of the evidence, (2) admitted for the purpose of proving a common plan or scheme, (3) relevant to prove an element of the crime charged or to rebut a defense, and (4) more probative than prejudicial.'"[16]

Airhart contends the court erred by excluding relevant evidence.[17] Even if correct, the point is immaterial. The court ruled against Airhart because he failed to show a prior bad act by a preponderance of the evidence.[18] The court repeatedly asked Airhart to provide some evidence to support his theory.[19] He did

---

[15] DeVincentis, 150 Wn.2d at 17.

[16] Id. (quoting State v. Lough, 125 Wn.2d 847, 852, 889 P.2d 487 (1995)).

[17] Airhart states that the court required proof of a "nexus" between the evidence and the defense's theory. He is understandably mistaken. The transcript of the June 21, 2018 pretrial hearing appears on page 20 to misattribute a prosecutor's statement to the court. In the statement, the speaker argues Airhart failed to establish a "nexus" to allow admissibility. This statement, which is the fourth full paragraph on page 20, is attributed to "the court" but is immediately followed by another statement by "the court," which is clearly responsive to the prior statement. The responsive statement asks a question of defense counsel, and it is apparent that the court was speaking. In addition, the court never again uses the word "nexus," but one of the prosecutors used it frequently.

[18] RP (June 25, 2018) at 140-41 (explaining Airhart could not ask whether Reno and R.F. fabricated the charges because "I don't think we have any evidence of that.").

[19] See, e.g., RP (June 21, 2018) at 18-19 (asking Airhart to explain how he would introduce evidence of the alleged conspiracy), at 52-54 (delaying ruling on this issue to give Airhart additional time to consider his trial strategy and whether a 404(b) hearing was required).

not.  Because Airhart did not provide evidence of a prior bad act, the court did not abuse its discretion by prohibiting questions on this topic.

II. Use of R.F.'s Initials in Court Documents

Airhart argues the use of R.F.'s initials in court documents instead of his name violated his right to a public trial.  We review alleged public trial violations de novo.[20]

Article I, section 10 of the Washington Constitution requires that "justice in all cases . . . be administered openly" and, together with article I, section 22, that an individual defendant has the right to a public trial.  For purposes of a public trial analysis, a court's use of initials in place of a full name in a court document is akin to redacting the document.[21]  Some redactions can constitute a closure, and a closure by redacting names is structural error when the court does so without conducting an Ishikawa[22] analysis on the record.[23]

But an Ishikawa analysis is not required if the public trial right has not been implicated or no closure actually occurred.  To determine whether a closure was justified, we apply a three-part test.[24]  First, we apply the experience and logic test

---

[20] State v. Smith, 181 Wn.2d 508, 513, 334 P.3d 1049 (2014).

[21] See Hundtofte v. Encarnacion, 181 Wn.2d 1, 6, 330 P.3d 168 (2014) (analyzing a court's decision to permit alteration of a case caption to use initials instead of names as a redaction).

[22] Seattle Times Co. v. Ishikawa, 97 Wn.2d 30, 640 P.2d 716 (1982).

[23] Doe G. v. Dep't of Corr., 190 Wn.2d 185, 201, 410 P.3d 1156 (2018) (citing State v. Bone-Club, 128 Wn.2d 254, 261-62, 906 P.2d 325 (1995)).

[24] Smith, 181 Wn.2d at 513-14.

to determine whether the public trial right has been implicated.[25] Second, we determine if a closure occurred.[26] Third, we perform an Ishikawa analysis to determine if the closure was justified.[27] But the third step is not required if the answer at steps one or two is "no."[28] The appellant bears the burden on steps one and two, and the party seeking closure bears the burden on step three.[29]

Assuming without deciding that Airhart's position passes the experience and logic test, he fails to show a courtroom closure occurred. Our Supreme Court has recognized two types of courtroom closures: first, "'when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave,'" and second, "where a portion of the trial is held someplace 'inaccessible' to spectators."[30] Citing Hundtofe v. Encarnacion[31] and Doe L. v. Pierce County,[32] Airhart asserts closure occurred as a matter of law because R.F.'s initials were used. Both Hundtofte and Doe L. were civil cases in which

---

[25] State v. Love, 183 Wn.2d 598, 605, 354 P.3d 841 (2015) (citing Smith, 181 Wn.2d at 513-14).

[26] Id. (citing Smith, 181 Wn.2d at 513-14).

[27] Id. (citing Smith, 181 Wn.2d at 513-14); see Smith 181 Wn.2d at 520 (explaining that a Bone-Club analysis is required for this analysis).

[28] See id. (no public trial violation if, under step two, no closure occurred).

[29] Id. (citing Smith, 181 Wn.2d at 516-17).

[30] Id. at 606 (quoting State v. Lormor, 172 Wn.2d 85, 93, 257 P.3d 624 (2011)).

[31] 181 Wn.2d 1, 330 P.3d 168 (2014).

[32] 7 Wn. App. 2d 157, 433 P.3d 838 (2018).

plaintiffs sought to remain totally anonymous, including when testifying.[33]
Hundtofte and Doe L. are distinguishable because granting a plaintiff total
anonymity effectively makes a portion of the trial inaccessible to spectators.

Here, R.F. testified under his full name in open court and was consistently
referred to by his full name.[34]  R.F.'s name was fully accessible to spectators and
open to any member of the public who appeared in court or read a transcript of
court proceedings.  Because Airhart fails to show a closure occurred, no Ishikawa
analysis was necessary.[35]

III. Use of R.F.'s Initials In Jury Instructions

Airhart argues the court commented on the evidence and vitiated the
presumption of innocence by using R.F.'s initials in the to-convict jury instructions.

We review jury instructions de novo within the circumstances of the entire
case to determine whether the judge commented on the evidence.[36]  If the court
commented, then we presume the comment was prejudicial, and the State must
show no prejudice occurred.[37]

---

[33] Hundtofte, 181 Wn.2d at 4-6; Doe L., 7 Wn. App. 2d at 163-64.

[34] E.g., RP (July 2, 2018) at 411 (State's opening argument referring to R.F. by name), at 440-41 (Reno providing R.F.'s name, date of birth, and current age); RP (July 9, 2018) at 689 (R.F. introducing himself with his full name, including his middle name).

[35] See Smith, 181 Wn.2d at 520.

[36] State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006); State v. Sivins, 138 Wn. App. 52, 58, 155 P.3d 982 (2007).

[37] Levy, 156 Wn.2d at 725.

Article 4, section 16 of the Washington Constitution provides that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." Article 16 guards against a jury being "unduly influenced by the court's opinion regarding the credibility, weight, or sufficiency of the evidence."[38] "[J]ury instructions that resolve factual issues *are* improper comments on the evidence."[39]

Airhart argues the judge effectively found R.F. to be a victim by referring to him by his initials. But where a victim's name is not an element of an offense, the court's use of an alleged victim's name in a jury instruction is not a comment on the evidence.[40] Under RCW 9A.44.083(1), a defendant is "guilty of child molestation in the first degree when the person has . . . sexual contact with another who is less than twelve years old . . . and the perpetrator is at least thirty-six months older than the victim." Although Washington pattern criminal jury instruction (WPIC) 44.21 includes a blank for an alleged victim's name, the name is not an essential element of the crime.[41] Because the name of a victim of child

---

[38] Sivins, 138 Wn. App. at 58.

[39] State v. Yishmael, ___ Wn.2d ___, 456 P.3d 1172, 1182 (2020).

[40] See Levy, 156 Wn.2d at 722 (concluding a court's use of a robbery victim's name in the to convict instruction was not a comment on the evidence because the victim's name is not an element of robbery).

[41] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 44.21 (4th ed. 2016) (WPIC).

molestation is not a factual issue requiring resolution, it would not constitute a comment on the evidence whether the court used R.F.'s name or initials.

Airhart also argues the court's use of R.F.'s initials in the to-convict jury instruction bolstered his credibility. A similar argument was made in State v. Alger where the defendant argued the judge's single reference to the crime victim as a "victim" was a prejudicial comment on the evidence.[42] This court concluded "the use of the term 'victim' has ordinarily held not to convey to the jury the court's personal opinion of the case."[43]

Here, the court referred to R.F. by his first name throughout the entire trial, including when the jury was present. Unlike the federal civil cases Airhart cites, where civil plaintiffs sought to appear and testify anonymously, R.F. appeared and testified under his own name. The jury was well aware of the alleged victim's identity and would have, upon seeing the two uses of R.F.'s initials in the to-convict instruction, merely recognized his initials as akin to his name. As in Alger, the use of "R.F." rather than a first name would not, without more, have bolstered his credibility.[44]

---

[42] 31 Wn. App. 244, 248-50, 640 P.2d 44 (1982).

[43] Id. at 249.

[44] Cf. State v. Magers, 164 Wn.2d 174, 184-86, 189 P.3d 126 (2008) (approving a trial court's use of a credibility instruction in a domestic violence case where the instruction referred to the complaining witness as a "victim.").

Airhart contends the use of R.F.'s initials in the jury instructions "effectively instructed the jury on his status as a victim" and violated his due process rights.[45] As explained, using R.F.'s initials is effectively no different than using his first name where the jury already knows his identity. Airhart fails to show a due process violation.

V. Petrich Unanimity Violation

Airhart argues he was convicted by a nonunanimous jury because the court relied on the model Petrich[46] unanimity instruction and the State "did not elect the specific acts [of molestation] it intended to rely on [for conviction]."[47] He contends this prejudiced him because "[t]his is not a case where three acts were described and three counts charged, implying unanimity."[48]

We review jury instructions de novo.[49] The model Petrich instruction, WPIC 4.25, is "an accurate statement of law" but it can be confusing when used in a multicount case based on multiple acts.[50] The risk of confusion is avoided, however, when the State elects which act is associated with each count charged.[51]

---

[45] Appellant's Br. at 57.

[46] State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984), abrogated in part on other grounds by State v. Kitchen, 110 Wn.2d 403, 405-06, 756 P.2d 105 (1988).

[47] Appellant's Br. at 43.

[48] Id. at 46.

[49] State v. Boyd, 137 Wn. App. 910, 922, 155 P.3d 188 (2007).

[50] State v. Carson, 184 Wn.2d 207, 217, 219, 357 P.3d 1064 (2015).

[51] See State v. Noltie, 116 Wn.2d 831, 842-43, 809 P.2d 190 (1991) (to preserve unanimity in a multicount case, the State must either elect the acts on

An effective election must "'clearly identif[y] the act upon which' the charge in question is based,"[52] and "disclaim its intention to rely on other acts for conviction" by doing so.[53]

The record does not support Airhart's arguments.[54] During closing, the prosecutor expressly linked a distinct act of alleged molestation to each count charged.

> You are all aware that [Airhart has] been charged with three counts of child molestation in the first degree, and all three counts require that the defendant have had sexual contact with [R.F.] on separate and distinct occasions between January 1, 2015, and July 31 of that year.
>
> . . . .
>
> And you will recall that I asked [R.F.] about a couple of specific events. And there was a reason for that. The defendant is charged with three counts of child molestation in the first degree, and while [R.F.] was molested far more than that by the defendant, your jury instructions require that . . .separate and distinct instances be proven. That's why I asked [R.F.] about a time he was molested by the defendant in his car, a time he was molested in the bedroom, and a time they were interrupted as he was being molested, by [Reno] returning home. Each of these instances can satisfy a

---

which it will rely for conviction or receive an effective unanimity instruction); see also Carson, 184 Wn.2d at 227 (a multiple acts unanimity instruction is required "only when the State fails to 'elect the act upon which it will rely for conviction.'") (quoting Petrich, 101 Wn.2d at 572).

[52] Carson, 184 Wn.2d at 227 (quoting State v. Thompson, 169 Wn. App. 436, 474-75, 290 P.3d 996 (2012)).

[53] Id. at 228 n.15.

[54] The State argues Airhart failed to preserve this issue for appeal by not objecting to the instruction at trial or by not complying with RAP 10.4(g) and designating the instruction for review in his assignments of error. Because Airhart's argument fails on its merits, we need not consider this procedural argument.

> distinct count.  The time in the car can be count one.  The time in the bedroom can be count two.  And the time the defendant's molestation of [R.F.] was interrupted by [Reno's] return home can be count three.[55]

The prosecutor clearly and expressly linked a single act of molestation to each charge.  Although Airhart argues the use of "can" meant the State failed to make a clear election, no reasonable juror would be confused about the State's elections.  Airhart fails to show he was convicted by a nonunanimous jury.

VI. Prosecutorial Misconduct

Airhart alleges five distinct instances of prosecutorial misconduct which, individually or collectively, he contends require reversal.

To show prosecutorial misconduct, a defendant must establish "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'"[56]  A prosecutor's conduct was prejudicial when the defendant can show "'a substantial likelihood [that] the instances of misconduct affected the jury's verdict.'"[57]  But when, as here, a defendant fails to object to improper conduct at trial, the error is waived unless the conduct "'is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'"[58]

---

[55] RP (July 10, 2018) at 874, 886-87 (emphasis added).

[56] State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting Magers, 164 Wn.2d at 191).

[57] Id. at 442-43 (quoting Magers, 164 Wn.2d at 191) (alteration in original).

[58] Id. at 443 (quoting State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)).

First, Airhart argues the prosecutor committed misconduct by asking whether R.F.'s testimony was untrue. When cross-examining a witness, a prosecutor engages in misconduct by asking questions "'designed to compel a witness to express an opinion as to whether other witnesses were lying.'"[59]

Airhart testified in his own defense. During cross-examination, the prosecutor asked Airhart a series of questions about R.F.'s testimony:

> Q: And when the detective asked you if you could think of any reason why [R.F.] would make this up, your answer was no?
>
> A: So to that, I definitely think now, um, could he be influenced by his mom? That's what I think, yeah.
>
> Q: So you think his mom put him up [to] this?
>
> A: Yes.
>
> Q: OK. Now you are not saying that you did these things that [R.F.] said you did, but it was an accident, [a]re you?
>
> A: No. I didn't do anything.
>
> Q: And you are not saying that you might have touched him some way, like accidently in the shower, and he misinterpreted it, [r]ight?
>
> A: No.
>
> Q: In fact, you never were in the shower with him in the shower, [r]ight?
>
> A: No.
>
> Q: He would have had no occasion to see your body then?

---

[59] State v. Vassar, 188 Wn. App. 251, 257, 352 P.3d 856 (2015) (quoting State v. Padilla, 69 Wn. App. 295, 299, 846 P.2d 564 (1993)).

A:    No.

Q:    And you are not saying that you did those things that [R.F.] said you did, but they weren't for the purpose of sexual gratification, [r]ight?

A:    I didn't do any of that. I don't know what you are saying. I didn't, I'm not doing these things.

Q:    You would agree that if a grown man did the things that [R.F.] said you did, watched sex videos with him and had him touch his penis, that clearly those things would be for the purpose of sexual gratification?

A:    I don't know what they would be for, because I'm not into that, uh, so no. I'm not—I don't have, I don't have any part of that. I'm sorry.

Q:    You are just saying that these things didn't happen?

A:    Those—none of that ever happened.

Q:    OK.

A:    Yeah, nothing like that. That's a lot.

Q:    And it's a lie that you believe originated—

A:    No. I said that's a lot.

Q:    It's a lot.

A:    Yeah, that's a lot to deal with. You know what I mean?

Q:    Yeah, I can imagine. But you are saying that [R.F.] is lying, [a]ren't you?

A:    Uh, yeah. If he is saying I did that, I did not do that.[60]

---

[60] RP (July 10, 2018) at 818-19.

16

Unquestionably, the prosecutor directly asked Airhart to comment on whether another witness lied. This was improper.[61] The question is whether, under the circumstances of the entire case, doing so was flagrant misconduct that could not have been cured by an admonition to the jury.[62]

In State v. Suarez-Bravo, the prosecutor engaged in misconduct and retrial was required when he "repeatedly attempted to get Suarez-Bravo to call the police witnesses liars" and "misrepresented the testimony of those witnesses in order to create a conflict which did not exist."[63] In State v. Boehning, the prosecutor engaged in misconduct and retrial was required after asking the defendant whether the alleged victim lied when she testified.[64] The cases are not analogous to the circumstances here.

Unlike the defendants in Suarez-Bravo and Boehning, Airhart advanced a theory that the State's witnesses were conspiring to lie. Similarly, in State v. Vassar, the prosecutor did not commit incurable misconduct when he asked the

---

[61] Vassar, 188 Wn. App. at 257.

[62] Id.

[63] 72 Wn. App. 359, 366, 864 P.2d 426 (1994).

[64] 127 Wn. App. 511, 524-25, 111 P.3d 899 (2005). Airhart also cites Boehning to argue prosecutors commit flagrant misconduct as a matter of law whenever they ask one witness if another is lying. Boehning generally supports this proposition. 127 Wn. App. at 525. However, our Supreme Court's longstanding requirement is that allegations of prosecutorial misconduct be evaluated "'in the context of the entire record and the circumstances at trial.'" See, e.g., Thorgerson, 172 Wn.2d at 442 (quoting Magers, 164 Wn.2d at 191). Here, we look to the context of the entire record to conclude there was no incurable misconduct.

17

defendant whether other witnesses were lying because the defendant herself brought up the issue in her direct testimony.[65]  And in State v. Thorgerson, our Supreme Court held that a prosecutor's improper bolstering of a complaining witness's testimony was not prejudicial where the defendant's theory was that the complaining witness and her boyfriend conspired to fabricate the charges against him.[66]

The core of Airhart's defense was that Reno and R.F. had made false accusations against him and could not be trusted.  While cross-examining R.F., Airhart asked several times if he would ever lie to protect someone.  Airhart also impeached R.F. with inconsistencies between his testimony about being molested and his prior statements to investigators.[67]  Airhart then asked R.F. a series of detailed questions about the color and shape of Airhart's penis and, during his case in chief, called two witnesses to contradict R.F.'s recollection.[68]  Airhart attacked R.F.'s credibility during his closing argument as well:

---

[65] 188 Wn. App. 251, 258, 352 P.3d 856 (2015).

[66] 172 Wn.2d 438, 446-48, 258 P.3d 43 (2011).

[67] Id. at 735-36.

[68] RP (July 9, 2018) at 736-37 (cross-examining R.F.), at 795-96 (Airhart testifying about the appearance of his penis); RP (July 10, 2018) at 854-55 (calling one of Airhart's sexual partners solely to testify about the appearance of his penis).

> At the end of the day, this comes down to who is more credible, [Airhart] or [R.F.]. [R.F.]'s story has changed at least three times. . . .
>
>     . . . .
>
>     . . . In this case, we have a child victim. An alleged victim. A complaining witness who has known motivations. Perhaps what was really poignant is when he met with the forensic interviewer and said, when he was asked early on why he was there, he said, "My mom just says because it is to protect us." Protect who? Her, [his half-sister], and [R.F.] We already know [Reno] did not like the fact that [Airhart] got visitation.[69]

It can hardly be prejudicial for the State to simply confirm the defendant's theory of the case, albeit bluntly. This is particularly true where the question was asked only once and a simple objection by defense counsel would have let the court admonish the jury to disregard the question.[70] Airhart fails to show incurable prejudice from the prosecutor's improper question.

Second, Airhart argues the prosecutor repeatedly disparaged defense counsel during closing argument. "It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity."[71] But in closing argument, the prosecutor "has wide latitude to argue reasonable inferences from the evidence, including evidence respecting the

---

[69] RP (July 10, 2018) at 906-07.

[70] See Thorgerson, 172 Wn.2d at 443 (incurable prejudice only where an admonishment to the jury would not "neutralize" any potential prejudice).

[71] Id. at 451.

credibility of witnesses."[72]  "It is not misconduct for a prosecutor to argue that the evidence does not support the defense theory."[73]

In his reply brief, Airhart lists seven ostensibly disparaging remarks, all of which come from the State's closing arguments.  For example, Airhart contends the prosecutor disparaged defense counsel's trial tactics by saying it was "absurd" to criticize a child witness when he could not recall the appearance of a defendant's genitals several years after seeing them.[74]  This is an argument about R.F.'s credibility based on his testimony.  A full review of closing arguments shows none of the allegedly disparaging remarks commented personally about defense counsel or impugned his credibility.[75]  The State made arguments based on the evidence.  The prosecution did not disparage defense counsel.

Third, Airhart argues the State shifted the burden of proof during closing argument.  "As mentioned, a prosecutor has wide latitude to argue reasonable inferences from the evidence.  However, it is improper for the prosecutor to argue that the burden of proof rests with the defendant."[76]

During the State's rebuttal closing argument, the prosecutor argued:

---

[72] Id. at 448.

[73] State v. Graham, 59 Wn. App. 418, 798 P.2d 314 (1990).

[74] Appellant's Br. at 28; Reply Br. at 8-9.

[75] See RP (July 10, 2018) at 878, 908-22.

[76] Thorgerson, 172 Wn.2d at 453.

> One of the ways to consider whether or not to believe something somebody wants you to believe is to ask yourselves what has to be true in order for that they want me to believe to be true? Let's cut to the core here. The defense is that [Reno] put [R.F.] up to this. And that everything [R.F.] has said or done since then has been at the urg[ing] of his mother. <u>What do you have to do to accept as true to buy that?</u>[77]

The prosecutor then discussed testimony and evidence in the case as it related to Airhart's theory and cast doubt on it. He closed by arguing,

> Ladies and gentlemen, the burden of proof in this case is beyond a reasonable doubt. It is not beyond all conjecture. It is not beyond any little idea somebody could float out there and hope <u>you</u> latch onto. It is proof beyond a reasonable doubt. And when you watch that video [of R.F. being interviewed] and review the testimony you have heard from every witness here, there is no doubt that [Airhart] did to [R.F.] what [R.F.] told you he did. Find him guilty.[78]

Airhart contends the use of "you" coupled with "what do you have to accept as true to buy that" "clearly insinuated the prosecutor's belief that, in merely putting forth a 'little idea' to this particular jury, [Airhart] did not put forth evidence justifying a finding of not guilty."[79]

In <u>State v. Fleming</u>, the prosecutor improperly shifted the burden of proof by arguing the absence of exculpatory evidence from the defendants meant the jury should find them guilty.[80] By contrast, in <u>Thorgerson</u>, the prosecutor did not shift the burden of proof where he discussed the "beyond a reasonable doubt" burden

---

[77] RP (July 10, 2018) at 920 (emphasis added).

[78] <u>Id.</u> at 922 (emphasis added).

[79] Appellant's Br. at 31.

[80] 83 Wn. App. 209, 214-16, 921 P.2d 1076 (1996).

of proof and argued the jury should convict the defendant if it believed the alleged victim's testimony.[81]

Here, as in Thorgerson, the prosecutor clearly stated the proper burden of proof and asked the jury to find Airhart guilty based on evidence presented by the State. Unlike Fleming, the State did not urge the jury to find Airhart guilty based on his failure to present evidence. Rather, the State urged the jury to find Airhart guilty if it found the State's witnesses credible and accepted their testimony as true. Because these arguments are based on the evidence and comment only on Airhart's theory of the case, the State did not shift the burden of proof.

Fourth, Airhart contends the prosecutor committed misconduct by violating the court's pretrial rulings. But Airhart fails to identify which pretrial rulings the State violated. Even if he had, a full review of the record shows no prejudicial violations of pretrial rulings.

Fifth, Airhart argues the prosecutor committed misconduct by referencing uncharged crimes and by suggesting Airhart molested his daughter. R.F. testified that Airhart molested him dozens of times. R.F. also testified he believed Airhart molested his half-sister. Because "a prosecutor has wide latitude to argue reasonable inferences from the evidence"[82] and the prosecutor's arguments here merely reflected the evidence, Airhart fails to show these arguments were improper.

---

[81] Thorgerson, 172 Wn.2d at 453-54.

[82] Id. at 453.

With the exception of directly asking Airhart to comment on R.F.'s truthfulness, the State's conduct was proper. Because Airhart did not object to these comments at trial and he fails to show they resulted in incurable prejudice, he waived these issues.

VII. Cumulative Error

Airhart argues reversal is required because of cumulative error. Because Airhart shows only a single nonprejudicial error, he does not establish cumulative error.

VIII. Community Custody Conditions

Airhart contends three conditions of community custody are erroneous and he should be resentenced. We review community custody conditions for an abuse of discretion and reverse only if "'manifestly unreasonable.'"[83] RCW 9.94A.703(3)(f) authorizes imposition of "any crime-related prohibitions." The prohibition must directly relate to the circumstances of the crime for which the offender was convicted.[84] A community custody condition is crime related if the court had a factual basis supported by substantial evidence linking the circumstances of the crime to the condition.[85]

First, Airhart argues that the community custody condition imposing a lifetime no-contact order as to his daughter violated his constitutional right to

---

[83] State v. Padilla, 190 Wn.2d 672, 677, 416 P.3d 712 (2018) (quoting State v. Irwin, 191 Wn. App. 644, 652, 364 P.3d 830 (2015)).

[84] Id. at 682 (citing RCW 9.94A.030(10)).

[85] Id. at 683.

parent. A community custody condition that interferes with the fundamental right to parent must be narrowly drawn and reasonably necessary to prevent harm to the biological child.[86] Where the evidence shows a restriction is reasonably necessary, however, a court can restrict a convicted sex offender's right to parent his children.[87] Here, the State concedes the record at sentencing did not support a lifetime no-contact order as to Airhart's daughter. We accept the concession. We remand for the trial court to consider whether the record supports imposing a no-contact order as to Airhart's daughter and, if so, the scope and duration of an order.

Second, Airhart argues special condition 6 is not crime related because there is no reasonable link between his crimes against R.F. and his work location. Condition 6 requires that Airhart "[o]btain prior permission of the supervising [community corrections officer] before changing work location."[88] He does not challenge the condition requiring that he notify his community corrections officer of any address or employment change. The State contends special condition 6 "is simply an extension of an undisputed mandatory condition, [and so] it need not be specifically crime related."[89] The State cites no authority for its position. And

---

[86] State v. Warren, 165 Wn.2d 17, 32, 34, 195 P.3d 940 (2008); State v. Corbett, 158 Wn. App. 576, 598, 242 P.3d 52 (2010).

[87] See, e.g., Corbett, 158 Wn. App. at 599-601 (affirming imposition of a no-contact order as to all of a sex offender's children when he was convicted of sexually abusing only one of them).

[88] CP at 63.

[89] Resp't's Br. at 77.

Airhart is correct that molesting R.F. was unrelated to his employment. Two of the three molestation attacks occurred in Airhart's home. The third occurred in his car, but that attack began with Airhart bringing R.F. from his home into the car. Because substantial evidence does not link the circumstances of Airhart's crime to the location of his work, the court abused its discretion by imposing this community custody condition.

Third, Airhart argues the several requirements in special community custody condition 5 are not crime related and violate his First and Fourteenth Amendment rights. Condition 5 requires that Airhart "[i]nform the supervising CCO and sexual deviancy treatment provider of any dating relationship [and] [d]isclose sex offender status prior to any sexual contact. Sexual contact in a relationship is prohibited until the treatment provider approves of such."[90]

Airhart contends this condition is not crime related because he was not in a dating relationship with his victim. Airhart accessed his victim only through his relationship with Reno. And in Airhart's future ongoing romantic or sexual relationships, his partners may have children vulnerable to his predations. His community corrections officer and treatment provider must be aware of these relationships to protect public safety and assess Airhart's readiness to be around children. Because his relationship with Reno, regardless of whether it was

---

[90] CP at 63.

romantic or purely sexual, was required to access R.F., the condition is crime related.

Airhart also argues the sex offender status disclosure requirement violates his First Amendment rights because it compels speech and is overbroad.  The First Amendment protects "'both the right to speak freely and the right to refrain from speaking at all.'"[91]  A community custody condition may place limitations on an offender's First Amendment rights so long as it is "sensitively imposed"[92] and "reasonably necessary to accomplish the essential needs of the state and public order."[93]

Airhart fails to provide germane case law to support his contention the disclosure requirement is overbroad.[94]  Even if he had, the condition was sensitively imposed and reasonably necessary to protect the children of an adult with whom Airhart has an ongoing sexual relationship.[95]  Despite having an active

---

[91] State v. K.H.-H., 185 Wn.2d 745, 748, 374 P.3d 1141 (2016) (quoting Wooley v. Maynard, 430 U.S. 705, 714, 97 S. Ct. 1428, 51 L. Ed.2d 752 (1977)).

[92] State v. Bahl, 164 Wn.2d 739, 757, 193 P.3d 678 (2008).

[93] Padilla, 190 Wn.2d at 684 (citing id.).

[94] Airhart cites to Packingham v. North Carolina, ___ U.S. ___, 137 S. Ct. 1730, 198 L. Ed. 2d 273 (2017), but the case is inapposite.  In Packingham, the United States Supreme Court analyzed a North Carolina law that prohibited any registered sex offender from accessing "a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages."  137 S. Ct. at 1733.  This broad restriction was unconstitutional because it suppressed lawful speech in a public forum.  137 S. Ct. at 1736-37.  No such risk is alleged or present here.

[95] See In re Pers. Restraint of Waggy, 111 Wn. App. 511, 517, 45 P.3d 1103 (2002) ("[P]reventing harm to minor children by a convicted sex offender is a compelling state interest that justifies limitations on the offender's freedoms.").

sexual relationship with Reno, having a child with her, and living together, Airhart testified he and Reno were not in a relationship "at all" and were not dating.[96] Airhart perceived his relationship with Reno as an ongoing, nonromantic, sexual relationship, and he used that relationship to access his victim. Airhart also maintained active and ongoing nonromantic sexual relationships with other woman, even while on trial. A present or future partner could, like Reno, have young children, and disclosing his sex offender status protects those children. The disclosure requirement is linked directly to the crime because Airhart could access R.F. only through his relationship with Reno, and Airhart regularly had nonromantic sexual relationships with a number of women. Restricting this condition only to romantic or dating relationships would not have, from Airhart's perspective, required disclosure of his sex offender status. In this circumstance, the disclosure requirement was sensitively imposed. The condition is valid.

Airhart contends special condition 5 infringes on his substantive due process right to marry because he must receive permission from his sexual deviancy treatment provider before engaging in sexual contact.[97] Although both romantic relations and sexual activity are constitutionally protected,[98]

---

[96] RP (July 9, 2018) at 784-85.

[97] Airhart cites Lawrence v. Texas, 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2005) and Obergefell v. Hodges, ___ U.S. ___, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015), but neither of those cases involved convicted child molesters or restrictions that protected children.

[98] See, e.g., Obergefell, 135 S. Ct. at 2599 (the constitution protects choices concerning marriage, contraception, family relationships, procreation, and childrearing).

"constitutional rights are lessened or not applicable" in the context of probation because "criminal convictions result in [the] loss or lessening of constitutional rights."[99] In In re Personal Restraint of Waggy, a sex offender convicted of child rape and molestation challenged a community custody condition requiring that he notify his community corrections officer of future relationships with adult women.[100] The court upheld the condition because it did not restrict his freedom to associate although it "obviously affect[ed] Mr. Waggy's privacy."[101]

Similarly, Airhart is still free to engage in sexual conduct and to begin romantic relationships with consenting partners. But because his sexual partners should be empowered to decide whether Airhart can be trusted around any young children in their lives, they must be informed of public information about him.[102] As in Waggy, any embarrassment due to his sex offender status results from Airhart's criminal behavior,[103] and he has no right to the confidentiality of his conviction records or sex offender status. This condition has been sensitively imposed to

---

[99] K.H.-H., 185 Wn.2d at 749; cf. Kansas v. Hendricks, 521 U.S. 346, 357-60, 117 S. Ct. 2072, 138 L. Ed.2d 501 (1997) (affirming that Kansas statute authorizing civil commitment for sex offenders did not violate substantive due process rights under the Fourteenth Amendment).

[100] 111 Wn. App. 513, 517, 45 P.3d 1103 (2002).

[101] Id. at 518.

[102] See Doe G., 190 Wn.2d at 199 ("[T]he names of people convicted of criminal offenses, including sex offenders, have historically been open to the public.").

[103] 111 Wn. App. at 518.

protect public safety, and Airhart fails to show a violation of his substantive due process rights.

Therefore, we affirm Airhart's convictions and remand for proceedings consistent with this opinion.

_____

WE CONCUR:

_____     _____