IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>              Respondent,<br><br>       v.<br><br>ISAAC OLAJUWON WEBBER,<br><br>              Appellant. | No. 87671-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — Isaac Webber appeals from convictions of one count of rape of a child in the first degree and one count of child molestation in the first degree after a jury trial. Webber asserts that the prosecutor committed misconduct during closing argument that deprived him of the right to a fair trial and the sentencing court deprived him of the right to be free from cruel and unusual punishment by imposing against him a term of total confinement for life without the possibility of release following his third conviction for a most serious offense. We disagree and affirm.

FACTS

On January 13, 2021, Isaac Webber visited the apartment of his sister, Naomi Webber, with the intention of staying overnight. Naomi shared the apartment with Gary Leaeno and their nine-year-old daughter, K.[1] That night,

---

[1] We refer to the defendant as Webber and use Naomi Webber's and Gary Leaeno's first names for clarity and consistency. No disrespect is intended.

Naomi and Gary slept in their own bedroom, Webber was to sleep on an extra mattress placed on the living room floor, and K was to sleep on a nearby couch.

Sometime after Naomi and Gary went to sleep, K ran to their bedroom, awakened them, and told them something about how Webber had just interacted toward her, the specifics of which became a disputed issue in the resulting criminal prosecution. The parties generally agreed, however, that after K spoke to her parents, Naomi told Gary to get Webber out of their apartment, Webber eventually left, and Naomi called 911.

Law enforcement officers who arrived at the scene shortly thereafter later testified that they observed that K "was visibly upset. She was crying and she was holding on to her mother tightly. She had her face buried in her mother's chest." K was then transported via ambulance to Mary Bridge Children's Hospital for a sexual assault examination.

After arriving at the hospital, K was examined by Michelle Breland, a pediatric nurse practitioner in the Child Abuse Intervention Department. Breland's medical assistant was the only other person present for K's examination. According to Breland, K told her that "[K's] uncle did something bad to [her]," that he "got on top of her and pulled her pants down," and that "his private was on [hers]," and his "private part . . . went in [her] private part."

Several days later, on January 18, K met with Jennifer Schooler, a child forensic interviewer at the Child Advocacy Center of Pierce County. K agreed to participate in a video-recorded interview. During the interview, without her parents

present, K disclosed to Schooler a series of events similar to that which she conveyed to Breland:

> So, when he was there at my house, I was just asleep . . . he was touching my legs, and I was trying to go to sleep. He pulled down my pants and stuff, and—he like pulled down his pants and put his part on mine. And I said, "Can you get off of me?" So, after that part, I went to go tell my mom. . . .
>
> I ran and knocked on my mom's door, and they opened it for me. And I was talking to them and saying that [sic] what he did to me. . . .
>
> So when I went to go talk to my mom . . . I said, "Your brother was touching all over me and he was pulling down his pants and he pulled my pants down." . . . [M]y mom told me to show her what happened. . . . When I said he pulled down my pants, my dad really got mad.

The State charged Webber with one count of rape of a child in the first degree. Between early 2021 and early 2023, trial on the charges was repeatedly continued due in part to a sudden lack of cooperation from Naomi, Gary, and K.[2] In February 2023, the State filed an amended information that also added one count of child molestation in the first degree.

In May, the court held a three-day child hearsay hearing regarding the admissibility of certain statements made by K. K, Naomi, Gary, Schooler, and Breland testified at the hearing. Notably, during K's cross-examination, she repeatedly testified "yes" in response to defense counsel's questions as to whether "a lady" (a defense investigator) had visited her and her parents about one week prior, whether she told the lady that on the night in question "[she] got scared in the middle of the night because [her] uncle sleeps on the couch, and [she] woke

---

[2] The court later ordered Naomi and K to appear for deposition, and they were deposed in November 2022 and May 2023, respectively.

up and he was standing over [her] and it scared [her]," whether she "then . . . ran and told [her] mom that [she was] scared," and if that was "all that happened."

The prosecutor noted for the record that during the State's direct and re-direct examination during the hearing, K "was very non-verbal most of the time. Looked down. Would not look up, and would not answer many of the questions." The court indicated that this characterization "reflect[ed] [its] observations as well," and defense counsel, for his part, noted, "[K] answered my questions pretty clearly when I asked her."[3]

A six-day jury trial commenced in early June, and the State called K as its first witness. For most of the first half of K's direct examination by the prosecutor, she either did not respond to the questions following long moments of silence or said "no." The court granted the State's request to ask K leading questions, and the remainder of the State's direct examination of K followed a similar pattern, with K either not answering the State's questions even after the prosecutor waited for a response or answering "no" in response to the State's questions, including those about what happened on the night in question, whether she rode in an ambulance, whether she went to a children's hospital, whether she spoke with and was examined by a nurse or participated in an interview, and whether she could identify herself in a photograph. During this exchange, the prosecutor stated, "Please let the record reflect that she's not looking at me at all," and the court responded, "The record reflects that." The prosecutor asked K several times whether Webber put

---

[3] The court ruled that, if K were available and testified at trial, Naomi, Breland, and Schooler would be able to testify to that which they recalled K had told them.

his private part on her private part and whether she ever told anybody, including a nurse, that he did, K either did not respond or stated "no."

On cross-examination, K more readily answered defense counsel's questions and the following exchange occurred:

> Q. Okay. I'll try to make this quick, and we will just talk about some things. Okay?
> About two years ago, you woke up, it was in January, I think it was 2021. You said your uncle was standing over you and you were scared. Is that true?
> A. Yes.
> Q. And his clothes were on though, right?
> A. Yes.
> Q. And so were yours?
> A. Yes.
> Q. He never took your clothes off, did he?
> A. (No response.)
> Q. He didn't take your clothes off. You had pajamas on, right?
> A. (No response.)
> Q. Well, we'll get back to that.
> That scared you when you saw him standing over you because it was dark, right?
> A. Yes.
> Q. And you ran and woke up your mom and dad?
> A. Yes.
> Q. And told them you were scared?
> A. Yes.
> Q. Okay. And he never touched your private part, did he?
> A. (No response.)
> Q. He never touched your private part, did he?
> A. No.

The State declined to conduct redirect examination and instead continued on with its case in chief, calling Gary and Naomi to testify. Gary testified that "the only thing [he] heard" when K entered their bedroom on the night in question was "'uncle was over me.'" Naomi, for her part, testified that K told her, "'your brother tried to touch me,' . . . or something like that."

- 5 -

Thereafter, the State called Breland to testify, and she reiterated what K had told her in her examination on the night in question. Schooler later testified and, after laying the foundation for Schooler's forensic interview with K five days after the incident in question, the State played for the jury the video recording of that roughly 30-minute interview.

Prior to the parties' closing argument, the court issued an instruction to the jury that stated, "It is important . . . for you to remember that the lawyers' statements are not evidence."[4] In the State's initial closing argument, the prosecutor argued that the jury should not rely on K's recantation and should instead rely on the evidence from the night in question and the days after. Webber's trial counsel responded in closing by arguing that the jury should rely on K's recantation because it was credible and made under oath and because Breland and Schooler were unreliable.

The prosecutor began the State's rebuttal closing argument by reminding the jury of the court's first instruction that "what the attorneys say is not evidence" and organized the rebuttal by opposing certain points defense counsel had made in closing argument. In responding to one of defense counsel's arguments, the prosecutor incorrectly told the jury that "again, it wasn't until she was in front of all of us strangers, and her grandmother in the courtroom, and the defendant in the courtroom that she backed down."

The jury was excused to their deliberations and, later that day, convicted Webber as charged. At sentencing, it was undisputed that Webber had previously

---

[4] The court had also instructed the jury at the beginning of trial that "the lawyers' statements are not evidence or the law."

been convicted of two most serious offenses,[5] that both of his convictions arising from the jury's verdicts in the instant case were also most serious offenses, that either would constitute his third such conviction, and that pursuant to the mandate of the Persistent Offender Accountability Act[6] (POAA), he was a persistent offender and the court was required to sentence him to a term of total confinement for life in prison without the possibility of release.[7] The court sentenced him accordingly.

Webber timely appealed.[8]

## ANALYSIS

Webber asserts that the prosecutor engaged in reversible misconduct at the close of his trial and the sentencing court erred when it imposed an unconstitutional sentence.[9] As to both assertions, we disagree.

## I. Prosecutorial Misconduct

Webber first contends that the prosecutor committed various instances of misconduct during closing argument. As to each alleged instance, he does not establish misconduct, much less that reversal is warranted on this basis.

---

[5] *See* RCW 9.94A.030(32) ("Most serious offense"). This is also commonly referred to as a "strike" offense.

[6] RCW 9.94A.555; Laws of 1994, ch. 1, § 7.

[7] *See* RCW 9.94A.030(37) ("Persistent offender"); .570.

[8] Following oral argument in this matter, the State filed a statement of additional authority pursuant to RAP 10.8. After the seven-day response deadline had passed, *see* RAP 10.8(c), Webber filed a motion to extend time to file a response and attached to that motion his response. In the interest of justice, we grant his motion and allow his late-filed response. *See* RAP 1.2. We discuss the substance of these filings, *infra*.

[9] Webber also asserts that his defense attorney's decision not to file a motion for a new trial based on this alleged misconduct deprived him of the right to effective assistance of counsel. However, because this ineffective assistance of counsel (IAC) claim is predicated on his claims of prosecutorial misconduct, and we conclude that no such misconduct occurred, the IAC challenge necessarily also fails.

"The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012) (plurality opinion) (citing *Estelle v. Williams*, 425 U.S. 501, 503 (1976); *State v. Finch*, 137 Wn.2d 792, 843, 975 P.2d 967 (1999) (plurality opinion)). "Prosecutorial misconduct may deprive a defendant of [their] constitutional right to a fair trial." *Id.* at 703-04.

> To establish prosecutorial misconduct, [an appellant] must show that the prosecutor acted improperly and that the conduct prejudiced [their] right to a fair trial. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). A defendant who does not object to alleged misconduct waives any claim of error unless [they] show[] the misconduct was so flagrant and ill intentioned that a jury instruction could not have cured the resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). . . . We consider alleged improper statements by a prosecutor in the context of the argument as a whole, the issues in the case, the evidence, and the jury instructions. *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

*State v. Lucas-Vicente*, 22 Wn. App. 2d 212, 223-24, 510 P.3d 1006 (2022).

Webber's trial counsel did not object to the statement that he now challenges on appeal. Therefore, he must establish that the deputy prosecutor's statement was made flagrantly and with ill intention and any resulting prejudice could not have been cured by a jury instruction.

A.    Misstatement of the Evidence by Prosecutor in Closing

Webber first asserts that the prosecutor committed misconduct that was both flagrant and ill intentioned by misstating the record in closing argument when discussing the timing of K's recantation. The State responds that the trial

prosecutor's "[i]nnocuous misstatement" did not amount to misconduct. We agree with the State that no misconduct occurred.

Here, as set forth *supra*, K recanted her accusation against Webber prior to trial during an interview in early 2023 with a defense investigator and again at the pretrial child hearsay hearing. During the State's initial closing argument, although K's recantations prior to trial had not been presented as evidence before the jury, the prosecutor stated,

> [K] admitted to making a statement not long before that to the defense team. That was her recant statement, that the defendant was merely standing over her that night and that's all that happened. She gave you zero detail about that recant statement.
> In fact, that recant statement came as a result of a leading question by defense; "Isn't it true that you told my investigator that he was just standing over you?" So those weren't even [K]'s words. Those were defense's words asking her a leading question. All she had to do was say yes.

During Webber's closing argument, his trial counsel acknowledged this statement, responding, "As counsel for the State said, [K] said the same thing to the defense interviewer weeks before." The prosecutor then began rebuttal closing argument by stating the following:

> First of all, I'd like to remind you that in jury instruction number 1, the jury instruction says what the attorneys say is not evidence. So you need to refer to your notes, your memories, your collective memories, and the evidence in order to make your decisions.
> You are the trier-of-fact. If I or [defense counsel] have gotten something wrong, and it contradicts what your memories, notes, and collective memories are, rely on you guys. Because what we say is actually not evidence.

Thereafter, while responding to Webber's argument in closing regarding DNA evidence that had been presented at trial, the prosecutor stated,

> You as jurors don't leave your common sense at the door, but also know that what is said in this courtroom is what this trial is about, not speculation *and not what attorneys say*.
>
> Defense also argues that DNA is not a magic solution. I would agree, especially in a case like this. DNA is not, like I said, what you see on CSI.[10] There's not like a smoking-gun DNA situation that we have in this case. However, it does provide corroboration for [K]'s statements. Statements that she's made over and over and over again. *And again, it wasn't until she was in front of all of us strangers, and her grandmother in the courtroom, and the defendant in the courtroom that she backed down*.

(Emphasis added.) The prosecutor then continued discussing the DNA evidence.

On appeal, Webber asserts that the government's misstatement in rebuttal closing about when K first recanted constituted reversible misconduct, incurable by jury instruction, that was both flagrant and ill intentioned.[11] We disagree.

In the context of the argument as a whole, the issues in the case, the evidence, and the jury instructions, the challenged misstatement did constitute misconduct. The State correctly concedes that the prosecutor did not accurately portray the evidence in the case relating to the timing of K's recantation. However, a prosecutor's mere misstatement of the evidence does not, by itself, amount to misconduct that deprives a defendant of the constitutional right to a fair trial. Indeed, "[i]t is well settled that a litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials." *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 267, 172 P.3d 335 (2007) (citing *Brown v. United States*, 411 U.S. 223, 231-32 (1973)).

---

[10] "CSI" refers to the television series "CSI: Crime Scene Investigation."

[11] Webber's appellate briefing does not challenge the portion of the State's initial closing argument that referenced the fact of K's earlier recantations. Instead, Webber's briefing characterized such statements in initial closing as the State admitting that the recantation had occurred.

Furthermore, this misstatement was of the type curable by jury instruction and, notably, such an instruction was twice issued to the jury by the trial court. As established *supra*, the court instructed the jury, both at the opening of trial and prior to summation by the parties, that the attorneys' statements were not to be considered by the jury as evidence in the case. It is also notable that the prosecutor began her rebuttal closing by reminding the jury that statements such as hers are not to be considered as evidence. Then, a few moments later, immediately prior to the challenged misstatement, the prosecutor once again reiterated the court's instruction to the jury. The instructional reminder was therefore fresh in the jury's mind at the time that the prosecutor uttered the statement at issue herein. This further supports that the misstatement was of the type curable by jury instruction.

Additionally, even if the challenged misstatement amounted to misconduct, the record does not support that it was made flagrantly or with ill intention. For instance, the record does not reflect that the prosecutor repeated or emphasized K's recantation; it was not the theme of the State's closing argument. Indeed, the record reflects that the misstatement was not only made in passing while discussing another topic, but also contradicted her initial closing argument, telling the jury, in effect, that the recantation happened prior to trial and also did not happen until K took the stand at trial.[12] Further, the prosecutor's own reminders

---

[12] Additionally, although the prosecutor's initial closing argument referenced facts not in evidence at trial when she stated that K had admitted to recanting to Webber's defense team prior to trial, Webber's trial counsel not only did not object to this, but also referenced these facts in his closing argument. Therefore, any error arising from the prosecutor's reference of such facts in closing was waived by Webber at trial.

of the court's admonishment that the argument of counsel was not evidence is at least suggestive of an awareness of the need for precision, which undercuts any claim of ill intent. Thus, the foregoing does not suggest that the prosecutor made the challenged statement flagrantly or with ill intention. Therefore, Webber's assertion of prosecutorial misconduct based on misstatement of the trial evidence fails.[13]

### B. Right To Be Present at Trial

Webber next asserts that the prosecutor committed misconduct by relying on his presence in the courtroom as part of establishing K's motive to falsely recant at trial. Again, we disagree.

A criminal defendant has a fundamental due process right to be present at all critical stages of a criminal proceeding. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011); U.S. CONST. amends. VI, XIV. Webber, however, does not cite to any decisional authority expressly holding that a prosecutor who references the fact of a defendant's presence in the courtroom as part of the State's case in chief deprives the accused of their right to be present at trial. Nor does Webber provide any reasoning in support of extending such a proposition to the decisional authority

---

[13] We also note that Webber's briefing initially asserted that the State committed misconduct in closing argument by arguing that K told her parents immediately after the incident that Webber had "pulled down his pants" and that "he touched her." The basis for Webber's challenge was that no testimony supported the State's argument.

Following oral argument in this matter, the State filed a statement of additional authority identifying that the exhibit of K's forensic interview, which was admitted and played for the jury, contained several statements by K supporting this portion of the State's argument in closing. Webber then submitted a response conceding that such statements were not misconduct, effectively withdrawing that assignment of error. We accept Webber's concession.

he cites.[14]  This court does not consider arguments unsupported by adequate citation to legal authority and argument.  *See* RAP 10.3(a)(6).

Nevertheless, even if we were to consider his claim, it would fail.  Here, the prosecutor stated in closing argument,

> Remember [K] was testifying in front of the defendant, in front of a bunch of strangers, all of you, all of us.  She was also testifying in front of her grandmother that she loves.  And testimony throughout this trial was clear that the grandmother supports this defendant.  The mom and dad . . . were not happy about the prosecution of the defendant either.
> . . . .
> [K], as you can see, was put in a very difficult position.  She has to face her family if she does not recant.  And the amount of pressure on [K] is enormous.  The pressure leaves her more vulnerable than she already is.  Her actions on the stand are understandable.  She doesn't get to see you guys again, but she does get to see her family again.
> . . . .
> . . . And again, it wasn't until she was in front of all of us strangers, and her grandmother in the courtroom, *and the defendant in the courtroom* that she backed down.

(Emphasis added.)

The record does not support that the prosecutor's reference to Webber's presence in the courtroom was improper.  For instance, the record does not reflect that the State sought to rely on Webber's exercise of his right to be present at the trial in order for the jury to draw a negative inference against him based on his *exercise* of that right.  Rather, the State relied on the fact of his presence, along with the presence of K's grandmother in the gallery and her parents' testifying as

---

[14] *See United States v. Jackson,* 390 U.S. 570, 583 (1968) ("Whatever the power of Congress to impose a death penalty for violation of the Federal Kidnapping Act, Congress cannot impose such a penalty in a manner that needlessly penalizes the assertion of a constitutional right."); *State v. Mace,* 97 Wn.2d 840, 844, 650 P.2d 217 (1982) ("Calling the defendant's postarrest silence to the attention of the jury, or suggesting that an unfavorable inference might be drawn therefrom violates" the defendant's constitutional due process right to remain silent at trial.).

witnesses in the case, to support its theory that K was motivated to falsely recant due to her family's involvement, observation, and participation in the case. In this light, the record does not support Webber's challenge that the prosecutor's statements were misconduct. Because of this, Webber also falls far short of carrying his burden to establish that any misconduct was so flagrant and ill intentioned that it could not be cured by jury instruction.

C.    Prosecutor's Statements in Rebuttal Closing Argument

Webber next asserts that the prosecutor committed further misconduct in rebuttal closing argument by inflaming the passion of the jury and by denigrating defense counsel. We again conclude that Webber has not established misconduct.

Our Supreme Court has stated that

> [a]lthough a prosecutor has wide latitude to argue reasonable inferences from the evidence, *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011), a prosecutor must "seek convictions based only on probative evidence and sound reason." *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991); *State v. Huson*, 73 Wn.2d 660, 663, 440 P.2d 192 (1968). "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." AM. BAR ASS'N, STANDARDS FOR CRIMINAL JUSTICE std. 3-5.8(c) (2d ed. 1980); *State v. Brett*, 126 Wn.2d 136, 179, 892 P.2d 29 (1995); *State v. Belgarde*, 110 Wn.2d 504, 755 P.2d 174 (1988).

*Glasmann*, 175 Wn.2d at 704. It later elaborated that

> [a] prosecutor can certainly argue that the evidence does not support the defense theory. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994) (citing *State v. Graham*, 59 Wn. App. 418, 429, 798 P.2d 314 (1990)). However, a prosecutor must not impugn the role or integrity of defense counsel. [*State v.*] *Warren*, 165 Wn.2d [17,] 29-30[, 195 P.3d 940 (2008)]; *State v. Negrete*, 72 Wn. App. 62, 67, 863 P.2d 137 (1993). Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present

- 14 -

[their] case and are therefore impermissible. *Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983) (per curiam).

*State v. Lindsay*, 180 Wn.2d 423, 431-32, 326 P.3d 125 (2014). Simply put, a prosecutor cannot "fundamentally undermine defense counsel's role or integrity." *Id.* at 433.[15]

Here, during Webber's closing argument, his trial counsel argued that K's recantation at trial was credible because, unlike when she spoke with her parents, Breland, or Schooler, she was called on at trial to speak under oath for the first time. Webber's counsel also argued that K's demeanor at trial could be explained by her realization of the seriousness of testifying under oath at trial. Additionally, defense counsel stated that K's statements made in response to his leading questions during cross-examination were reliable not only because the "whole purpose of cross-examination is to ask leading questions," but also because she could have responded "no" to such questions but did not. Defense counsel then argued that Breland and Schooler were unreliable witnesses because they were part of a "machine" that is set into motion whenever a child sexual abuse allegation is made regardless of the accuracy of the allegation, because Breland testified that she destroyed her original notes after she wrote her medical examination report,

---

[15] *See, e.g.*, *Lindsay*, 180 Wn.2d at 433 (holding that prosecutor stating, "This is a crock. What you've been pitched for the last four hours is a crock" impermissibly impugned defense counsel); *Thorgerson*, 172 Wn.2d at 451-52 (noting it was improper for prosecution to refer to defense counsel's presentation as "'bogus' and involving 'sleight of hand'"); *Warren*, 165 Wn.2d at 29 (explaining it was improper for prosecutor to describe "defense counsel's argument as a 'classic example of taking these facts and completely twisting them to their own benefit, and hoping that you are not smart enough to figure out what in fact they are doing'"); *Negrete*, 72 Wn. App. at 66 (prosecutor improperly stated defense counsel was "'being paid to twist the words of the witnesses'" (emphasis omitted)).

and because Schooler had asked K leading questions during her interview with the intention of having K say "what [Schooler] wants to hear."

In rebuttal closing argument, the prosecutor began by stating that "[her] job here is to rebut what [defense counsel] said," and, shortly thereafter, stated,

> [*Defense counsel*] *also just argued to you that* [K] made certain statements. And he ran a litany of statements by you about the defendant just standing over her on the couch, something like that. [K] never said that. It was [defense counsel]'s words. And he said that it's his job in cross-examination to use leading questions. But he doesn't have to.
>
> Those words were words that [defense counsel] said to [K], and she just quickly agreed. Get it over with, agree, move on, get out of this courtroom.
>
> So again, ask yourself if [K] actually said those words. Because when she was on the stand last week, she said very few words. And she certainly, certainly did not say in her own words, coming out of her mouth, using a narrative, the things that defense just argued to you. Again, those were all questions that were leading questions, and all she had to do was say yes or no.
>
> . . . .
>
> I am not going to yell at you that Ms. Breland and Ms. Schooler are credible witnesses. *They are professionals, unlike how defense characterized them*.[16]
>
> . . . .
>
> Michelle Breland has been taking care of kids for her entire career. *To accuse her of destroying evidence is insulting.* She explained to you exactly how that process is. She explained to you that her report contains everything she wrote in her notes, and she explained to you why she is obligated then to destroy those confidential patient notes.
>
> Michelle Breland testified to all of the statements that [K] made to her. Michelle Breland has no motive to make any of this up or to exaggerate or unexaggerated [sic] or overexaggerate. Again, she's been a nurse practitioner for 26 years, taking care of kids. Her job is to make sure those kids are okay, and her job is to follow the evidence based on what the child says.
>
> Same with Ms. Schooler. Ms. Schooler testified that she follows best practices in her job. If she were to do something outside of those best practices, and because best practices say don't ask kids certain things, then she would definitely be cross-examined

---

[16] Webber's trial counsel objected to this statement and the court overruled the objection. Webber does not challenge this ruling on appeal.

about not using best practices. So she's kind of damned if she does, damned if she doesn't in this courtroom.

She was following the best practices for her field and for her expertise. And again, you will get to watch the forensic interview, if you'd like, again. You can watch how exactly that whole interview takes place. Especially in light of the fact that we've now talked about things that you can look for. Again, while you're watching that, ask yourself: *Does Jennifer Schooler really have this motive, an evil motive to frame* [*K*]? *She does not.*

And you watched that video, and you can watch it again. This is someone, again, who has a mask on, and [K] is very soft-spoken. It is very difficult—in fact, we had to turn up the audio when everyone was listening to it because it was so difficult to listen to. You can find out for yourself. *Re-watch it and decide whether or not Jennifer Schooler had this evil intent to mislead* [*K*].

. . . .

*Finally, one more point, defense talked to you a lot about the oath, and talked to Ms. Schooler a lot about taking an oath.* First of all, you have a 12-year-old coming into the courtroom, facing a bunch of strangers. All she is told [sic] to raise her right hand, and the judge says something to her. She sits down and she immediately puts her head down and immediately starts refusing to answer questions during long pauses. Even when the judge made sure that she could hear the question.

Again, this happened for a very long time. She is trying to survive in this family. Being under oath clearly does not hold the same significance to [K], a 12-year-old, as it does to defense counsel. And also, nowhere in the jury instructions, and this is very important, does it tell you that someone being under oath is a dispositive credibility factor.

(Emphasis added.)

On appeal, Webber asserts that the prosecutor's arguments in rebuttal were intended to inflame the passion of the jury and denigrate the position of defense counsel and, therefore, constituted prosecutorial misconduct. This is so, Webber contends, because the prosecutor inflamed the passion of the jury when she emphasized K's vulnerable situation with her family and hardship in testifying as a witness and denigrated the position of defense counsel when she highlighted his use of leading questions during K's cross-examination and sought to rehabilitate

Breland and Schooler's credibility by arguing that they did not have an "evil motive" or "evil intent." Because each of those rebuttal statements were made in response to argument made by defense counsel in closing and the subject matter thereof was not otherwise improper, the prosecutor did not commit misconduct in making those statements.

As an initial matter, the context surrounding each of the challenged statements plainly reflects that they were made in response to Webber's trial counsel's arguments in closing, not as part of a strategy to inflame the passions of the jury or denigrate the role of defense counsel. For instance, the record reflects that the prosecutor expressly oriented each of the statements now challenged on appeal with reference to what defense counsel "just argued" about, "talked" to the jury about, or how defense counsel "characterized" the State's witnesses.[17]

Moreover, the record also reflects that the subject matter of the prosecutor's arguments in rebuttal was proper; in referencing K's vulnerability, the prosecutor was seeking to bolster the State's theory that K had a motivation to falsely recant and was seeking to argue that if defense counsel had not asked K leading questions, she would not have recanted at trial. In emphasizing reasons the jury could conclude that Breland and Schooler were reliable witnesses, the prosecutor was seeking to rehabilitate their credibility following defense counsel's

_____

[17] Webber, without citing to decisional authority, also contends that the prosecutor's referring to defense counsel by his name during closing argument constituted denigration of the role of defense counsel. We do not consider arguments unsupported by legal authority. *Cowiche Canyon Conservancy v. Bosley,* 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Nevertheless, even if we did consider this contention, we would disagree. Identification of an attorney at trial by a title (e.g., Mr. or Ms.) followed by their last name is a routine trial practice and the record plainly reflects that the prosecutor was identifying defense counsel by his name in order to respond to his arguments in closing, not to denigrate his role as Webber's trial counsel.

impeachment thereof in closing, addressing each of defense counsel's points in turn.

Furthermore, Webber does not present decisional authority expressly holding that mentioning a child victim's vulnerability in her family situation and hardship in testifying as a witness is conduct calculated to inflame the passion of the jury. Instead, Webber cites to caselaw not meaningfully comparable to the State's conduct here. In one such example, *Glasmann*, the prosecutor's closing argument featured a 50-plus slide presentation containing multiple altered photographs with captions superimposed on them (e.g., "GUILTY"), challenging the jury to question the truthfulness of the defendant's testimony. 175 Wn.2d at 709-10. In the other, *State v. Claflin*, 38 Wn. App. 847, 850, 690 P.2d 1186 (1984), the prosecutor's closing argument featured the reading of a "poem utilizing vivid and highly inflammatory imagery in describing rape's emotional effect on its victims" in the context of an "emotionally charged" trial where the prosecution alleged "a pattern of repulsive sexual and physical abuse of young girls over a long period of time" by the defendant.

Webber's reliance on these cases is unavailing. The conduct by the prosecutors in both *Glasmann* and *Claflin* was significantly inflammatory and the absence of any other reason justifying such conduct on the record therein plainly suggested that the prosecutors' intent was to inflame the passions of the jury. The same cannot be said here; as explained *supra*, the State invoked K's vulnerability as a means of supporting its position that she had a motive to falsely recant. Moreover, Webber does not present additional argument in support of extending

the reasoning in the foregoing cases to the matter here. We do not address arguments unsupported by argument. *See Cowiche Canyon*, 118 Wn.2d at 809.

As such, Webber does not establish that the challenged statements by the prosecutor were improper.[18] Given that, it logically follows that he does not establish that such statements were made flagrantly or with ill intention. Thus, as to each of the prosecutor's statements challenged as misconduct on appeal, Webber has not carried his burden. Accordingly, he does not establish an entitlement to appellate relief.[19]

II. Racial Disproportionality and Persistent Offender Accountability Act

Webber next asserts that the sentencing court deprived him of the right to be free from cruel and unusual punishment when, in light of his three convictions for most serious offenses and pursuant to the mandate of the POAA for offenders with such a criminal history, the court sentenced him to a term of total confinement for life in prison without the possibility of release. Webber contends that this was unconstitutional because Washington courts have applied the POAA in a racially disproportionate manner, particularly as to Black defendants like him.

---

[18] Webber nevertheless asserts that the prosecutor's statements that "the amount of pressure on [K] is enormous" and "the pressure leaves her more vulnerable than she already is" denigrated defense counsel and his function. This assertion is unpersuasive. The record reflects that this was not a reference to the role or integrity of defense counsel but, rather, was a reference to the prosecution's argument that K's family dynamics had placed pressure on her to falsely recant.

Webber next argues, without providing citation or further argument, that "the prosecutor also denigrated counsel by repeatedly suggesting that he had somehow done something improper in summarizing the testimony." We decline to consider this unsupported argument. *See Cowiche Canyon*, 118 Wn.2d at 809.

[19] As part of raising his prosecutorial misconduct claim, Webber also asserts that we should reverse and remand this matter due to cumulative error arising from the alleged prosecutorial misconduct. However, because we conclude that no such misconduct occurred, we similarly hold that there was no cumulative error.

Again, because we conclude that no such misconduct occurred, Webber's separate contention of ineffective assistance of counsel on the basis of failing to seek a mistrial also fails.

Webber did not raise this issue at his sentencing. Under RAP 2.5(a)(3), a party may raise "manifest error affecting a constitutional right" for the first time on appeal. However, he did not present this matter on appeal as a manifest constitutional error and failed to cite RAP 2.5 or otherwise argue the relevant standard in his opening, and only, brief. We therefore decline to reach this issue on that basis.

More critically, even if we were to consider this issue, Webber has not established that he would prevail on the merits. Since 2021, in both published and unpublished decisions, this court has repeatedly considered and rejected a racial disproportionality challenge to the constitutionality of the POAA. *See, e.g., State v. Nelson*, 31 Wn. App. 2d 504, 550 P.3d 529, *review denied*, 3 Wn.3d 1030 (2024); *State v. Freeman*, No. 85134-9-I (Wash. Ct. App. May 27, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/851349.pdf; *State v. Legrone*, No. 85116-1-I (Wash. Ct. App. Sept. 23, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/851161.pdf, *review denied*, 4 Wn.3d 1008 (2025); *State v. Simmons*, No. 80563-1-I (Wash. Ct. App. Oct. 25, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/805631.pdf, *review denied,* 199 Wn.2d 1003 (2022); *State v. Kennon*, No. 80813-3-I (Wash. Ct. App. Aug. 16, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/808133.pdf, *review denied,* 198 Wn.2d 1039 (2022).[20]

---

[20] Pursuant to GR 14.1(c), we may cite to unpublished opinions as "necessary for a reasoned decision." These unpublished opinions are offered to illustrate the degree to which challenges to the constitutionality of the POAA have been rejected by this court and, as discussed here in Part II, to provide context for our electing to decline to revisit this topic in light of our Supreme Court's denial of review in those cases where a discretionary review petition was filed.

Furthermore, in those instances where discretionary review was sought on the basis of this court's rulings on the constitutionality of the POAA, our Supreme Court has consistently denied review, leaving this court's decisions undisturbed. *See State v. Legrone*, 4 Wn.3d 1008 (2025); *Nelson*, 3 Wn.3d 1030 (2024); *State v. Simmons*, 199 Wn.2d 1003 (2022); *State v. Kennon*, 198 Wn.2d 1039 (2022).

Webber has not presented persuasive argument or evidence in support of departure from the foregoing precedent.[21]  Therefore, even if he had met the threshold showing under RAP 2.5(a)(3) for the otherwise unpreserved error to be considered for the first time on appeal, we decline his invitation to revisit the constitutionality of the POAA.

Affirmed.

WE CONCUR:

---

[21] As Division Two of this court articulated in *Nelson*,

> Like the Supreme Court in [*State v. Jenks*, 197 Wn.2d 708, 712, 487 P.3d 482 (2021)], we have serious concerns about the racially disproportionate impact of the POAA.  However, this disproportionate impact likely is due to systemic racial injustice throughout the criminal justice system rather than the administration of the POAA.  We are not in a position to address these systemic problems.

31 Wn. App. 2d at 517.  Additionally, because Webber did not raise this issue in the trial court, we do not have before us a record setting forth comprehensive data and analysis in support of considering an alternative proposition.